Michael T. RIGGS

v.

CITY OF FORT WORTH, et al.

No. CIV.A.4–00–CV–816–Y.

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 1, 2002.

James C Mosser, Attorney at Law, Byron K Henry, Attorney at Law, Law Office of James C Mosser, Dallas, TX, for Michael T Riggs, plaintiff.

Richard E Henderson, Attorney at Law, Christopher B Mosley, Attorney at Law, Fort Worth City Attorney's Office, Fort Worth, TX, for the City of Fort Worth, Ralph Mendoza, Individually and in his official capacity, Doe 1 Through Doe 10, defendants.

*ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO QUALIFIED IMMUNITY*

MEANS, District Judge.

Pending before the Court is defendant Ralph Mendoza's Motion for Summary Judgment as to Qualified Immunity [doc. #30-1], filed June 11, 2001. Having carefully considered the motion, response, and reply, the Court finds that the motion should be GRANTED.

## I. RELEVANT FACTS [1]

On October 16, 1995, plaintiff Michael T. Riggs "entered the police academy, as an employee of the city of Fort Worth, Texas." (Pl.'s Am. Or. Compl. ("Pl.'s Compl.") ¶ 6.) At that time, Thomas R. Windham was the chief of police for the Fort Worth Police Department and defendant Mendoza was the deputy chief of police. (*Id.* ¶ 10.) At some point after becoming a Fort Worth police officer, Plaintiff was assigned to the North Division Bike Unit. (*Id.* ¶ 16.)

On September 9, 1998, after discussion with his supervisor, Plaintiff ordered the towing of a 1998 green Cadillac, which later turned out to belong to the mayor of Fort Worth. (*Id.* ¶ 17.) Plaintiff, after completing a memorandum about the incident, was informed by his superiors that he had done nothing wrong. (*Id.* ¶ 19.)

Twenty-seven days after the towing incident, Plaintiff, on October 6, received a notice from one of his superiors that he was no longer authorized to wear bicycle shorts or short sleeve shirts and that he was only authorized to wear a police uniform consisting of long sleeves and long pants. (Pl.'s Compl. ¶ 20.) On October 20, Plaintiff met with Chief Windham to discuss the order. (*Id.* ¶ 28.) Plaintiff alleges that during the meeting Chief Windham indicated that the whole issue regarding Plaintiff's tattoos was first brought to the chief's attention by the mayor after Plaintiff ordered that the mayor's vehicle be towed. (*Id.*)

---

1. The Court notes that the chronology of facts set out by Plaintiff in his amended original complaint, Rule 7(a) reply, and his other supporting documents is, at times, unclear and confusing.

In December 1998, Plaintiff was transferred from the bike unit to the DWI unit. (Mendoza Aff. at 1; Pl.'s Compl. ¶¶ 35, 37.) Plaintiff claims that the transfer was "like being demoted or fired." (Pl.'s Resp. Def.'s Mot. Summ. J. ¶ 10mm.) In a letter to Plaintiff dated January 28, 1999, Chief Windham, explaining his reasons for requiring Plaintiff to wear long sleeves and long pants, wrote, "You have extensive tattoos on your arms and legs which I believe detract from the professionalism of a Fort Worth police officer if the officer wears short sleeve shirt and shorts." (App. Pl.'s Resp. Mot. Summ. J. at 30.) On August 8, Plaintiff suffered from heat exhaustion while on duty and was temporarily transferred to a desk job. On August 18, Plaintiff was assigned to a "plain clothed" traffic-investigation unit and instructed not to wear a uniform. (Riggs Aff. ¶ 34.) He was later allowed to wear a uniform, but only if it once again included long sleeves and long pants. (Pl.'s Rule 7(a) Reply ("Pl.'s 7(a) Reply") ¶ 5vv.)

On August 19, 1999, Mendoza began his duties as acting chief of police. On September 10, Plaintiff had a meeting with Mendoza. Both parties agree that in the meeting Mendoza instructed Plaintiff that he did not have to wear a protective vest if Plaintiff was too hot in long sleeves. Plaintiff also alleges that Mendoza stated that Plaintiff would never leave the desk job or be promoted because of the tattoo issue. (Riggs Aff. ¶ 35.)

In October 1999, Plaintiff was assigned to the DWI unit midnight shift. (Mendoza Aff. at 2.) Mendoza was sworn in as chief of police on February 2, 2000. On July 3, Plaintiff filed his original complaint against the defendants.[2] Sometime later, Plaintiff was placed "back on the streets." (Pl.'s Mem. In Opp'n To Def.'s Mot. Summ. J.

("Pl.'s Mem.") ¶ 10eee.) On July 5, Plaintiff again suffered from heat exhaustion while on duty, and his physician instructed him not to wear long sleeves in hot weather. (*Id.* ¶ 10jjj.) Plaintiff was placed on desk duty for a week and then reassigned to street duty. (Riggs Aff. ¶ 38.)

In January 2001, Plaintiff's attendance at a "DWI instructor's school" was temporarily postponed so that other officers could attend. (Pl.'s Mem. ¶ 10fff.) Both parties agree that Mendoza temporarily postponed Plaintiff's training due to the "diversity make-up" of the current DWI instructors on the police force. (Mendoza Aff. at 3; Pl.'s Compl. ¶ 57.) Mendoza claims that Plaintiff, along with two other officers whose training was also postponed, were sent to the next available DWI instructor's school. (Mendoza Aff. at 3.) Plaintiff alleges that in March he was advised by one of his superiors that he was removed from the instructor's list because he had filed this suit against the defendants. (Riggs Aff. ¶ 43.)

In late February, Plaintiff was informed that he was not selected for "motorcycles" because he had used too many sick and family days. (Pl.'s Mem. ¶ 10hhh.) Plaintiff claims that his not being chosen was in retaliation for his filing this suit against the defendants. (Riggs Aff. ¶ 38.) Plaintiff, on July 5, again suffered from heat exhaustion and was ordered by his physician not to wear long sleeves in weather over 90 degrees. (*Id.* ¶ 44.) On July 13, Plaintiff was suspended from the police department without pay. (Pl.'s Mem. ¶ 10sss; Riggs Aff. ¶ 53.)

## II. STANDARD OF REVIEW

Summary judgment is proper when the record establishes that no genu-

---

2. Plaintiff filed his original petition in state court. Defendants, on July 11, removed the cause to federal court.

ine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Hill v. London, Stetelman, & Kirkwood, Inc.*, 906 F.2d 204, 207 (5th Cir.1990). To determine whether an issue of material fact exists, the Court must first consult the applicable substantive law to ascertain what fact issues are material to the disposition of the case. *Lavespere v. Niagara Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir.1990), *cert. denied*, 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993). The Court must then review the evidence presented, viewing the facts and inferences drawn from those facts in the light most favorable to the nonmoving party. *See Newell v. Oxford Management Inc.*, 912 F.2d 793, 795 (5th Cir.1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir.1989). However, the Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the movant bears the burden of proof on a claim or defense, he must establish all elements of the claim or defense to prevail on summary judgment. *Western Fire Ins. Co. v. Copeland*, 651 F.Supp. 1051, 1053 (S.D.Miss.1987), *aff'd*, 824 F.2d 970 (5th Cir.1987).

When the moving party has carried its summary-judgment burden, the respondent "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The respondent must produce evidence, not merely argument, in response to a movant's properly supported motion for summary judgment. *See Foval v. First Nat'l Bank of Commerce*, 841 F.2d 126, 129 (5th Cir.1988); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir.1987).

▉ Defendant Mendoza seeks summary judgment on the basis that he is entitled to qualified immunity for his actions toward the plaintiff. To the extent Plaintiff seeks money damages directly from defendant Mendoza for his actions taken under color of state law, Mendoza may invoke his right to qualified immunity. *See Hafer v. Melo*, 502 U.S. 21, 26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Public officials performing discretionary functions enjoy immunity from suits for damages, provided their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be resolved at the earliest possible stage in the litigation. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

▉ When determining whether immunity exists, the Fifth Circuit uses a three-part inquiry. *See Conroe Creosoting Co. v. Montgomery County, Tex.*, 249 F.3d 337 (5th Cir.2001). First, a court must examine whether the plaintiff has alleged the violation of a constitutional right. *Id.* Second, a court must determine whether the constitutional right was clearly established at the time the defendant acted. *Id.* "For a right to be clearly established, there does not have to be a prior case directly on point, but the unlawfulness of the precipitating acts must be apparent in light of the existing law." *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir.1995). Such an inquiry requires an assessment of whether, at the time of the alleged violation, the right was so clearly established that a "reasonable person" in the defendant's situation would have understood that his conduct violated that right. *See Siegert v. Gilley*, 500 U.S.

226, 231–32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Conroe Creosoting Co.,* 249 F.3d at 340; *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993), *cert. denied,* 510 U.S. 1123, 114 S.Ct. 1081, 127 L.Ed.2d 397 (1994). Finally, a court must "determine whether the record indicates that the ... defendant actually engaged in the conduct that violated the clearly established right." *Conroe Creosoting Co.,* 249 F.3d at 340; *see Morris v. Dearborne,* 181 F.3d 657, 666 (5th Cir.1999).

## III. DISCUSSION

In view of the law regarding qualified immunity discussed above, the first issue is whether Plaintiff has demonstrated a violation of a constitutional right. Here, Plaintiff has asserted claims against Mendoza under 42 U.S.C. § 1983 for violation of his civil rights under the Equal Protection Clause of the United States Constitution.[3]

3. The Court notes that in Plaintiff's amended original complaint, Plaintiff asserts eight causes of action against the defendants, several of which have already been disposed of by the Court in previous orders. Because neither the defendant nor the plaintiff have addressed any additional causes of action against Mendoza, the Court assumes that Plaintiff is not pursuing them.

4. A newspaper article titled "Pedaling for Fund–Raiser" from the October 5, 1998, edition of the Fort Worth Star–Telegram describes Plaintiff's tattoos as follows:

> From wrist to shoulder his right arm has a Celtic tribal design. His left arm has another Celtic design that includes 'Cheryl,' the name of his wife of 11 years. His right leg has a mermaid from knee to his waist. There's a family crest on his chest. Cartoon character Jessica Rabbit ('She's not bad, she's just tattooed that way') is on his forearm.
>
> . . . .
>
> But Riggs' most astonishing piece of body art is a two-foot by two-foot full color rendering on his back of St. Michael spearing Satan.

*See* Appendix to Plaintiff's Response to Motion for Summary Judgment at 18.

(Pl.'s 7(a) Reply at 1.) Plaintiff makes two basic allegations: (1) that Mendoza unlawfully removed him from his position in the bike patrol unit to a less desirable job because Plaintiff has a number of tattoos[4] on his body that were visible to the public when he wore the bike-patrol uniform, and (2) that he has been ordered by Mendoza, in violation of the Fort Worth Police Department's dress code,[5] to wear long sleeves and long pants to cover his tattoos. Plaintiff calls himself a white male of Celtic descent and claims that he has been singled out because of his race, sex, national origin, and his statements of expression. By "statements of expression," the Court understands Plaintiff to be referring to his tattoos.[6] (Pl.'s Compl. ¶ 56; Pl.'s 7(a) Reply ¶ 5.)

The Equal Protection Clause of the Fourteenth Amendment provides that no

5. The dress code, which is contained in Fort Worth Police Department General Order 501, sets out various rules and regulations relating to the "Wearing of the Police Uniform." It does not contain any specific provisions regarding tattoos. The dress code also provides that "police personnel in the department shall wear such uniform and insignia as the Chief of Police prescribes." Fort Worth Police Department General Order § 501.01(B).

6. Race, sex, and national origin are protected categories under the Equal Protection Clause. *See Cleburne,* 473 U.S. at 432, 105 S.Ct. 3249. Race and national origin are "suspect" categories and sex (gender) is a "quasi-suspect" category. *See Cleburne,* 473 U.S. at 432, 105 S.Ct. 3249. Statements of expression can be considered speech that is protected by the Equal Protection Clause as a fundamental right under the First Amendment. *See Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (stating that certain conduct, if communicative in nature, amounts to protected speech); *see also City of Chicago Police Dep't.,* 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (stating that the "Equal Protection Clause requires that statutes affecting First Amendment rights be narrowly tailored to their legitimate objectives").

state shall "deny any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend XIV, § 1. It "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Before determining the validity of any classification scheme under the Equal Protection Clause, the Court must first decide the proper standard of review. Generally, "legislation is presumed to be valid and will be sustained if the classification drawn ... is rationally related to a legitimate state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249; *see Stefanoff v. Hays County, Tex.,* 154 F.3d 523, 525 (stating that to establish a violation of the constitutional right to equal protection, Plaintiff must prove that Defendant created two or more classifications of similarly situated people that were treated differently and that the classification had no rational relation to any legitimate governmental objective). However, if the classification is based on the "suspect" classifications of race, alienage, or national original or if a fundamental right is involved, the classification will be subjected to strict scrutiny and will only be upheld if the law is tailored to serve a compelling state interest. *See Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249. If the classification is based on a "quasi-suspect" classification such as gender, the classification "fails unless it is substantially related to a sufficiently important governmental interest." *Id.* at 4440–41, 105 S.Ct. 3249.

■ To make out an apparent equal-protection claim, a plaintiff must show three things: (1) that he is a member of a protected class, (2) that he is otherwise similarly situated to members of the unprotected class, and (3) that he was treated differently from members of the unprotected class. *See McNabola v. Chicago Transit. Auth.,* 10 F.3d 501, 513 (7th Cir. 1993); *see also Cleburne,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To prevail, the plaintiff then must demonstrate that the defendant acted with a discriminatory purpose. *See Lavernia v. Lynaugh,* 845 F.2d 493, 496 (5th Cir. 1988).[7] That is, the plaintiff must prove that the defendant "singled out a particular group for disparate treatment and selected his course of action at least in part for *the purpose* of causing its adverse effect on an identifiable group." *Lavernia v. Lynaugh,* 845 F.2d 493, 496 (5th Cir.1988) (emphasis in original); *see Edwards v. Johnson,* 209 F.3d 772, 780 (5th Cir.2000).

Since Riggs alleges discrimination (being required to wear long sleeves and long pants and being transferred out of the bike unit) based on his race, sex, national origin, and his exercise of his fundamental right of free expression, he invokes the Court's strict scrutiny. Thus, such discrimination, if any he can prove, will be excused only if it is employed to serve a compelling state interest, or in the case of sex, it is substantially related to a sufficiently important governmental interest. Even so, to establish a constitutional violation under the Equal Protection Clause, Riggs must allege and prove his race, his sex, his national origin, or his protected expressions; show how he is otherwise similarly situated to those not of his race,

---

7. *See also Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944) (stating that the "unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination"); *Huebschen v. Dep't of Health and Social Servs.,* 716 F.2d 1167, 1171 (7th Cir.1983) (stating that to prevail on a claim under the Fourteenth Amendment, a plaintiff must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual).

sex, national origin or who have made protected expressions; and demonstrate how he was treated differently. *See McNabola*, 10 F.3d at 513. Then, Riggs must show that Mendoza intentionally treated him differently because of his race, sex, national origin, or his protected expressions. *See Lavernia*, 845 F.2d at 496; *see also Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir.1988) (stating that in order to recover on a disparate treatment claim based on sex under Title VII, which mirrors the proof required in order to recover on an equal protection claim under § 1983, the plaintiff must prove intentional discrimination by showing that the "adverse employment decision would not have been made 'but for' her sex").

■ Even assuming Plaintiff has established the first three elements of a violation of the Equal Protection Clause, Plaintiff fails to provide any non-conclusory evidence[8] that Mendoza singled him out and forced him to wear a uniform consisting of long sleeves and long pants or transferred him out of the bike unit because he was either white, male, of Celtic descent, or a combination of the three. In fact, Plaintiff has provided evidence that indicates the contrary.

In the appendix accompanying his response to Defendants' Motion for Summary Judgment, Plaintiff attaches a "List of Officers with Tattoos" that lists 15 other police officers in the City of Fort Worth Police Department that also allegedly have tattoos. The list contains the 15 individuals' names, their sex, their race, and the location of each individual's tattoo(s). (App. Pl.'s Resp. Def.s' Mot. Summ. J. at 47.) The "List of Officers With Tattoos" shows that there are other white, male police officers that have tattoos that have not been required to wear long sleeves and long pants to cover their tattoos. *See* Pl.'s Amend. Compl. ¶¶ 56j, 56o, 66; Pl.'s 7(a) Reply ¶¶ 5e. This evidence directly contradicts Plaintiff's claim that Mendoza discriminated against him based on his race or gender.

In addition, the plaintiff has provided no evidence describing the national origin of any other police officer other than himself or indicating that Mendoza made his decisions based on Plaintiff's Celtic origin. Thus, there is no proof that Mendoza intentionally discriminated against Plaintiff because of his national origin.

Finally, the plaintiff presents evidence that he was transferred out of the bike unit shortly after being required to wear long sleeves and long pants. He also presents evidence showing that he has suffered from heat exhaustion on at least three occasions since being required to wear long sleeves and long pants. This evidence also weighs against any intentional discrimination based on sex, gender, or national origin, and, instead, points to health and safety concerns as plausible reasons for Mendoza's actions in transferring Plaintiff out of the bike unit.[9]

---

8. See, *e.g.*, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 3, which states, "Mendoza has instituted his discriminatory policy, not because of any unique safety concern associated with the police department business, but rather, because of Officer Riggs' race and sex which has prompted the non-uniform application of the subject policy against persons of Caucasian, male Celtic descent.

9. Plaintiff claims that Mendoza totally disregarded his health and safety by requiring him

to wear long sleeves and pants, especially in the hot Texas summers and against the advice of Plaintiff's physicians. Mendoza does not dispute that he required Plaintiff to wear long sleeves and long pants. However, both parties present evidence that Mendoza told Plaintiff that he did not have to wear a protective vest if Plaintiff was too hot. In addition, the evidence shows that Plaintiff was transferred to jobs more suitable to his required uniform such as the DWI unit where he was in an air-conditioned vehicle, the "plain clothes" investigation unit where he did not have to wear a

Plaintiff provides only two reasons, other than race, sex or national origin, for Mendoza's adverse treatment: (1) Mendoza is discriminating against his protected expression—his tattoos—and (2) Mendoza is carrying out former Chief Windham's retaliation against Plaintiff for unknowingly ordering the towing of the mayor's car in September 1998. (Pl.'s Compl. ¶¶ 17, 28, 56k, 64; Pl's 7(a) Reply ¶¶ 5k, 5v, 5eee.)

With respect to his tattoos, Plaintiff appears to be arguing that his rights under the Equal Protection Clause are being violated because he is being treated differently from similarly situated persons with tattoos by being forced to cover his tattoos and, as a result, being transferred out of the bike unit. Plaintiff claims that this anti-tattoo discrimination is a violation of his fundamental right to freedom of expression under the First Amendment.[10] *See Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212

(1972) (stating that governmental action permitting some to speak, but denying the opportunity to others, raises an "equal protection claim [that] is closely intertwined with First Amendment interests").

■ As with any analysis regarding the First Amendment, the threshold issue is whether tattoos are a form of expression or speech that is protected by the First Amendment. Although few Courts have considered the issue, those that have appear to agree that a tattoo is not protected speech under the First Amendment. *See Stephenson v. Davenport Comm. Sch. Dist.,* 110 F.3d 1303 (8th Cir.1997) (stating that "the tattoo is nothing more than 'self-expression,' unlike other forms of expression or conduct which receive first amendment protections"); *People v. O'Sullivan,* 96 Misc.2d 52, 409 N.Y.S.2d 332 (N.Y.App. Div.1978) (stating that tattooing is not speech or even symbolic speech).[11] Because tattoos are not protected expressions under the fundamental First Amendment

uniform, and temporary desk jobs where he was indoors.

**10.** The First Amendment protects freedom of speech, and certain conduct, if communicative in character, amounts to protected speech. *See First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (financial contributions); *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (display of American flag with a peace symbol attached); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (wearing sign on the back of a jacket); *Tinker v. Des Moines Ind. Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing armbands).

**11.** Even assuming that tattoos were found to be speech protected by the First Amendment, it would appear that Mendoza's uniform policy as applied to Plaintiff would survive even the stricter standard for reviewing restrictions on government employee speech promulgated by the Supreme Court in *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *Pickering,* the Supreme Court set out a test that requires the Court to balance "the interests of the [em-

ployee], as citizen, in commenting upon matters of public concern and the interests of the State, as employer, in promoting the efficiency of the public services it performs though its employees." *Id.* at 568. Additionally, a public employee's speech is entitled to First Amendment protection only when that speech involves a matter of public concern as opposed to a matter of personal interest. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment").

With respect to the tattoos that could be seen by the public if Plaintiff were not required to wear long sleeves and pants, Plaintiff claims that his "tattoo of Celtic tribal designs is an expression of his heritage and a statement of his ethnicity" and his other tattoos are "artistic expression." (Pl.'s Rule 7(a) Reply ¶¶ 7, 8.) But clearly Plaintiff's tattoos are a way for him to express his personal views and beliefs and are not speech addressing a "legitimate public concern," as might be

right of free speech, strict scrutiny, though invoked by Riggs, is inappropriate. Instead, his claimed classification must merely be rationally related to a legitimate state interest. *See Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249; *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). In other words, for his order to pass a constitutional challenge, Mendoza must merely have some minimal justification for treating Plaintiff differently from other police officers with tattoos. *Id.*

█ Mendoza claims that the reason he has continued to enforce the policy requiring Plaintiff to wear long sleeves and long pants is "to insure a professional uniform appearance to the public of uniformed Forth Worth police officers." (Mendoza Aff. at 2.) Mendoza states that he "felt that displaying massive tattoos distracted from the uniform appearance necessary to good police work" and that a "police officer's uniform is not a forum for fostering public discourse or expressing one's personal beliefs." *(Id.)* Addressing the fact that Plaintiff is the only police officer required to cover his tattoos, Mendoza states, "No other Fort Worth police officer has been brought to my attention with such tattoos so as to rise to the level of unprofessional appearance as does officer Riggs." (Mendoza Aff. at 3.)

In *Kelley v. Johnson,*[12] 425 U.S. 238, 247, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), the Supreme Court held that a law enforcement agency's "[c]hoice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power." Courts have long held that "the city through its police chief has the right to promote a disciplined, identifiable, and impartial police force by maintaining its police uniform as a symbol of neutral government authority, free from expressions of personal bent or bias." *Daniels v. Arlington,* 246 F.3d 500, 503 (5th Cir.2001); *see United States Dep't of Justice v. Federal Labor Relations Auth.,* 955 F.2d 998, 1005–06 (5th Cir. 1992).[13] As a result, the Court concludes that Mendoza had legitimate, nondiscrimi-

the case if the tattoos were to state, for example, some political message. *See Daniels,* 246 F.3d at 503–04 (indicating that a police officer's desire to wear a cross pin on his uniform was not speech on a legitimate public concern but was, instead, a "symbolic conveyance of his religious beliefs" and "intensely personal in nature"). Thus, even if tattoos were found to be speech protected by the First Amendment, such speech, at least in this case, is not speech addressing a "legitimate public concern." *See Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 366 (5th Cir.2000). Consequently, as long as Mendoza has a rational basis for treating Plaintiff differently, then his policy will be upheld. *See* discussion *infra.*

12. In this case, the president of the Patrolmen's Benevolent Association challenged the constitutionality of a county regulation limiting the length of hair worn by male county police officers.

13. With respect to a police department policy regarding the length of a police officer's hair, the Court of Appeals for the Eighth Circuit stated:

We reject the idea that community standards provide a legitimate basis in weighing constitutional rights guaranteed to the individual. Whether public acceptance or rejection of a particular hair style exists in one community or another should not be a standard of concern to a federal court. What must be controlling to the court in evaluating competing interests is whether the policy of the state espouses a societal interest which outweighs the individual concern. Thus, what is essential here is that the Public Safety Department stresses the need for public respect of its officers and that it feels such respect flows in part from the officers' individual appearance. If [the police chief] misjudges, as plaintiff suggests, what necessary measures should be taken to achieve

natory reasons for requiring the only officer in the Fort Worth Police Department who has tattoos covering his legs and arms, plaintiff Michael T. Riggs, to wear a uniform that is not required of other police officers.

■ With respect to transferring Plaintiff out of the bike unit, Mendoza's testimony in his affidavit indicates that Plaintiff has never been demoted in rank and that he has received periodic increases in pay during his employment as a police officer.[14] In addition, Mendoza states that he has never discriminated against or retaliated against Plaintiff. Although Mendoza does not explicitly state a reason for Plaintiff's transfer (which was ordered by former Chief Windham), the evidence presented indicates that Plaintiff was transferred to assignments that were more accommodating to his required uniform of long sleeves and long pants and to his health and safety.

■ Because Mendoza has set forth rational reasons for his treatment of Plaintiff, to establish a constitutional violation, Plaintiff now bears the burden of showing that Mendoza's reasons are "wholly arbitrary," which means "having no rational basis." *See Karr v. Schmidt*, 460 F.2d 609, 616–618 (5th Cir.1972); *see also Stefanoff*, 154 F.3d at 525. Plaintiff argues that Mendoza's alleged reasons for his actions were merely a pretext to continue former police chief Windham's retaliatory policy against Plaintiff for ordering the towing of the mayor's car. Plaintiff claims that the timing of the order regarding Plaintiff's

uniform (a mere twenty-seven days after the towing incident) and former Chief Windham's own statements show that Plaintiff was being disciplined in retaliation for towing the mayor's car.

■ However, the evidence, even if viewed in the light most favorable to Plaintiff, does not suggest that Mendoza's uniform policy is arbitrary. A police officer's uniform is not a forum for fostering public discourse or expressing one's personal beliefs. *See Daniels*, 246 F.3d at 503. Mendoza believes that the massive tattoos that were exposed on Plaintiff's body if he wore short sleeves and short pants distract from the uniform appearance necessary to good police work. The fact that Plaintiff's personal appearance was brought to the attention of former Chief Windham by the mayor right after the mayor's car was towed for being illegally parked does not create a material factual dispute of whether the uniform policy was arbitrary and retaliatory. Mendoza does not dispute the fact that the uniform order was originally issued by Chief Windham a mere twenty-seven days after the towing incident. Even if the mayor was upset that Plaintiff had ordered his car to be towed, there is no evidence that the former police chief retaliated against Plaintiff for Plaintiff's actions.

■ In addition, although Plaintiff claims that being transferred out of the bike unit was a demotion, Plaintiff presents no evidence indicating that he was transferred out of the bike unit for any irrational or arbitrary reason.[15] *See Fior-*

---

community respect, this basically must be the department's concern, not ours.
*Stradley v. Andersen*, 478 F.2d 188, 190–91 (8th cir.1973).

**14.** According to Mendoza, Plaintiff is currently at the entry-level rank of police officer and has been so since his commissioning in 1996. (Mendoza Aff. at 2.) In addition, Mendoza states that in October 1998, Plaintiff earned

$16.92 per hour. As of June 2001, he earned $21.36 per hour. (*Id.*)

**15.** The Court notes that job reassignments may, in certain circumstances, be the basis of a civil-rights claim, but as to claims asserting violations other than equal protection, Courts have often stated that "it is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one that he

*enzo v. Nolan,* 965 F.2d 348, 352 (7th Cir.1992) (stating that if the plaintiff fails to present evidence refuting the testimony of a police chief about his intent in transferring three black officers, then the plaintiff fails to prove a constitutional violation). Plaintiff just makes conclusory statements, without proof, that the transfer was a demotion and in retaliation for the towing of the mayor's vehicle. Because there is no evidence that the former police chief or Mendoza acted out of retaliation when ordering Plaintiff to wear long sleeves and long pants or transferring Plaintiff out of the bike unit, the Court concludes that Mendoza's actions toward Plaintiff were not arbitrary.

Plaintiff has failed to present evidence showing that Mendoza treated Plaintiff differently based on Plaintiff's race, gender, national origin, or protected expression. He has also failed to make a showing that Mendoza does not have a rational basis for his decision to treat Plaintiff differently because of his tattoos. Plaintiff has not, consequently, demonstrated the violation of a constitutional right. *See Cleburne,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313; *Stefanoff,* 154 F.3d at 525. Mendoza is entitled to qualified immunity.[16] Accordingly, for the reasons stated above, the Court concludes that defendant Mendoza's motion for summary judgment as to qualified immunity is GRANTED.

■ Because Plaintiff has failed to demonstrate a constitutional violation under the Equal Protection Clause of the United States Constitution, Plaintiff has failed to establish a violation of § 1983 of Title 42 of the United States Code.[17] *See Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Harrington v. Harris,* 118 F.3d 359, 366 (5th Cir.1997) (stating that because Plaintiff failed to establish a First Amendment violation, Plaintiff failed to prove a case for a § 1983 claim of retaliation for the exercise of free speech).[18] Consequently, Plaintiff's equal-protection and § 1983 claims against the City of Fort Worth, as well as Mendoza, must be DISMISSED.

---

considers less desirable." *Serna v. City of San Antonio,* 244 F.3d 479, 483 (5th Cir. 2001); *see Forsyth v. City of Dallas,* 91 F.3d 769 (5th Cir.1996)

16. Even if the Court found that Plaintiff had asserted a violation of the Equal Protection Clause in that tattoos are expressions protected under the First Amendment, such a right was clearly not established at the time Mendoza acted. Few courts have even considered whether tattoos are expressions protected under the First Amendment. Of those that have, the majority have found that tattoos are not protected under the First Amendment. *See Stephenson v. Davenport Comm. Sch. Dist.,* 110 F.3d at 1307. Thus, it was not clearly established that it was unlawful for Mendoza to discriminate against Plaintiff because of the massive number of tattoos on his body. Therefore, Defendant would still be entitled to qualified immunity. *See Conroe Creosoting Co.,* 249 F.3d at 340.

17. Section 1983 of Title 42 of the United States Code imposes liability upon "every person who, under color of state law or custom, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates." *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir.1989). In order to state a valid claim under § 1983, Plaintiff must (1) allege a violation of rights secured by the Constitution or law of the United States and (2) demonstrate that the alleged deprivation was committed by a person [or entity] acting under color of state law. *See Collins v. City of Harker Heights;* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261. (1992); *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir.1997).

18. *See also Miller v. City of Nederland,* 977 F.Supp. 432, 438 (E.D.Tex.1997).

·Therefore, it is ORDERED that defendant Mendoza's motion for summary judgment as to qualified immunity is GRANTED. Plaintiff's claims against defendant Mendoza are hereby DISMISSED WITH PREJUDICE. In addition, Plaintiff's claims against the City of Fort Worth for violations of the Equal Protection Clause and § 1983 of Title 42 of the United States Code are also DISMISSED WITH PREJUDICE.