IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| AEGIS OF ARIZONA, L.L.C., an Arizona limited liability corporation, | ) ) ) | 2 CA-CV 2003-0057 DEPARTMENT B |
| Plaintiff/Appellee, | ) ) | O P I N I O N |
| v. | ) ) | |
| THE TOWN OF MARANA, a municipal corporation, | ) ) ) | |
| Defendant/Appellant. | ) ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20000299

Honorable Ted B. Borek, Judge

REVERSED AND REMANDED WITH DIRECTIONS

Law Office of George J. Feulner, P.C.
  By George J. Feulner                                                                Tucson
                                                       Attorney for Plaintiff/Appellee


Irvine Law Firm, P.A.
  By Thomas K. Irvine and Larry J. Wulkan                                          Phoenix
                                                  Attorneys for Defendant/Appellant

P E L A N D E R, Presiding Judge.

¶1          Appellant/defendant the town of Marana appeals from a judgment, entered upon

a jury verdict, awarding appellee/plaintiff Aegis of Arizona, L.L.C., $428,199.00 on its

substantive due process and equal protection claims, which it had brought under 42 U.S.C. § 1983 (hereafter § 1983).  On appeal, Marana challenges the judgment on several grounds.  Because we agree with Marana that the trial court erred in sending Aegis's constitutional claims to the jury, we reverse and remand the case with directions to enter judgment in favor of Marana.

## BACKGROUND

¶2        In reviewing a judgment based on a jury verdict, we view the evidence and all reasonable inferences therefrom in the light most favorable to sustaining the judgment.  *Pioneer Roofing Co. v. Mardian Constr. Co.*, 152 Ariz. 455, 462, 733 P.2d 652, 659 (App. 1986).  In 1997, Dean Fetherling began researching the feasibility of forming a company that would treat and dispose of medical waste using a "mobile medical waste treatment system[]," specifically, a machine called the "JYD1500."[1]  In late 1997 or early 1998, after satisfying himself that processing medical waste would be profitable, Fetherling formed Aegis.[2]  In February 1998, Aegis committed to buying the JYD1500 for $950,000.  For purposes of giving Aegis exclusive rights to conduct this type of medical waste disposal business in the state, the purchase agreement provided that the machine's seller would not sell similar equipment to anyone else in Arizona.

---

[1]The business was unique in that employees would travel to hospitals and doctors' and dentists' offices in the Tucson area and, using the JYD1500, sterilize and grind up certain types of medical waste—such as syringes, rubber gloves, and bandages—at those locations so that it could be disposed of there like any other non-medical-waste trash.  Testimony at trial established that disposing of medical waste in this fashion not only eliminates the risks involved in transporting such waste to incinerators located in other parts of Arizona but also eliminates air pollution caused by incinerating such medical waste, which is largely plastic material.

[2]Fetherling formed Aegis rather than keeping the business in his name because he hoped to give the business to his children to own and manage.  He testified at trial that he "did not want to own" Aegis.

¶3          The week after Aegis had committed to buy the JYD1500, Fetherling began looking for a location to house and maintain the machine, process a small amount of medical waste, and create office space for both Aegis and two Illinois businesses that he personally owned. Fetherling intended to purchase the property in his and his wife's names and then lease it to Aegis. Over the course of the next six to seven months, Fetherling looked at approximately fifty different pieces of property throughout the Tucson area in the hope of finding a location compatible with Aegis's business plan. He eventually decided to buy property located in Marana near Interstate 10 (the Camino Martin property). That property was zoned under Marana's Land Development Code (MLDC) for heavy industrial (HI) use, which is the most permissive zoning category.

¶4          The purchase contract for the Camino Martin property provided for a sixty-day "due diligence" period that allowed Fetherling to research information on the property, determine whether Aegis could conduct its business there, and, if necessary, cancel the sale. During that time period, Fetherling's agents sought to meet with representatives of Marana to determine whether the Camino Martin property's current HI zoning classification was compatible with Aegis's business plan.

¶5          Sometime in December 1998, Fetherling's agents (including his architect, William Gansline) and Joel Shapiro, Marana's then acting planning director, had a "pre[-]development plan application meeting." HI zoning under the MLDC did not expressly include medical waste processing as a permitted use. Nonetheless, Shapiro told Fetherling's agents that Aegis's proposed use was otherwise compatible with the Camino Martin property's HI zoning, and that the proposed use would be permitted on that property. As the planning director, Shapiro had the authority to "permit any other uses which may be determined to be similar to those listed [in the MLDC for

HI property], in conformity with the intent and purpose of th[at] zone."[3]    MLDC § 05.12.03(B)(9).  If a proposed use is permitted within a certain zone, a landowner need not apply for a conditional use permit (CUP).

¶6         According to Shapiro, he did not tell anyone at the December 1998 meeting that his oral decision to permit Aegis's proposed use was only preliminary or otherwise subject to review or change.  Following that meeting, on December 23, Fetherling finalized his purchase of the Camino Martin property.  And, in January 1999, Gansline submitted on Fetherling's behalf an "application for development/site plan review" to Marana.

¶7         In early February 1999, two months after Shapiro had told Fetherling's agents that Aegis's proposed use of the property would be permitted, Marana received letters from both Mark Ritter, who owned property adjacent to the Camino Martin property, and from various other home and business owners in the area.  The two letters voiced identical concerns about Aegis's proposed use.  In response to those letters, Marana decided to place the issue on the agenda of its Planning and Zoning Commission's February 24 meeting as an informal "informational item."  Shapiro testified that the purpose of discussing the issue at that meeting was to "strictly . . . provide the public with information" about Aegis's proposed use of the property, presumably because compliance with the public hearing procedures typically involved with rezoning property or issuing special use permits was not required.  Before that meeting was held, the Arizona Daily Star published an article entitled, "Medical-waste plant planned on NW side," that described Aegis's

---

[3]Although MLDC § 05.12.03(B)(9) referred to the "Planning Administrator," it is undisputed that Shapiro held that position.

proposed use of the property and the controversy it had caused among some of the adjacent landowners.

¶8        At the February 24 Planning and Zoning Commission meeting, Shapiro explained the general nature of Aegis's proposed use and the Camino Martin property's current HI zoning. He also expressed his view that the proposed use was permitted under that zoning category. An Aegis representative made a presentation on the nature of Aegis's business and answered questions from the commission. Ritter also spoke at the meeting and expressed his concerns about Aegis's proposed use.

¶9        Several weeks later, in a letter dated March 16, Shapiro informed Fetherling that, "[a]fter extensive consideration by staff, [and] in response to public concerns," "it ha[d] been determined" that Fetherling would be required to apply for and receive a CUP before his development plan could be approved. In response, Fetherling submitted, in his own name, an application for a CUP. Consistent with his earlier view that Aegis's proposed use would be permitted in the HI zone, Shapiro recommended that the Planning and Zoning Commission approve Fetherling's CUP application.

¶10        The commission considered the application at its April 28 meeting. The commission's staff recommended approval of the CUP application with conditions. An Aegis representative spoke at the meeting and presented general information on Aegis's business plan, the JYD1500, and the type of medical waste processing Aegis hoped to conduct on the property.[4]

---

[4]Fetherling testified that Aegis's original business plan called for between fifteen and twenty percent of Aegis's business to involve processing medical waste on the Camino Martin property. In hopes of appeasing those who opposed the CUP application, however, Aegis representatives later stated that it would not process any waste on the property.

5

Ritter and another owner of adjacent property also spoke at the meeting and expressed their opposition to the proposed use. The commission then unanimously denied Fetherling's CUP application.

¶11 Fetherling appealed the commission's decision to Marana's town council, pursuant to MLDC § 10.10(G). At its May 18 meeting, the council voted unanimously to affirm the commission's denial of the CUP application.

¶12 Aegis then brought this action against Marana asserting, inter alia, a claim for damages under § 1983 based on alleged deprivations of Aegis's federal constitutional rights to substantive due process and equal protection.[5] Specifically, Aegis claimed that Marana had violated its rights when, despite Shapiro's initial assurance that the use was permitted and that no CUP was required, it later required a CUP and then denied the CUP application. Marana moved for summary judgment, arguing that Aegis lacked standing to bring the action, that Aegis had failed to exhaust available administrative remedies because it did not appeal Marana's March 16 decision requiring a CUP application, and, in any event, that the town council had acted within its discretion in denying the CUP. Aegis later moved for partial summary judgment on the issue of liability.

¶13 In ruling on those motions, the trial court first concluded that Aegis had standing to bring this action. The court then denied Aegis's motion and largely denied Marana's motion

[5]In its initial and amended complaints, Aegis also alleged claims for an "inverse temporary taking," state law equal protection violations, violations of A.R.S. § 9-462.01(C) (which relates to conditional uses), tortious interference with contract, "supplying false information for guidance in business transactions," and "estoppel." All of those claims eventually were dismissed and are not at issue here. *See* ¶14, *infra.*

6

as well.  As discussed in detail below, however, the trial court concluded that Aegis had failed to exhaust available administrative remedies as to Marana's decision to require a CUP.  *See* ¶35, *infra.*  Accordingly, to that limited extent, the trial court granted Marana's summary judgment motion.  The case then proceeded to trial.

¶14             After Aegis rested its case at trial, Marana moved for judgment as a matter of law (JMOL) on all of Aegis's claims.  The trial court granted that motion as to all counts except Aegis's § 1983 due process and equal protection claims.  Only those two claims were sent to the jury.

¶15             On a special verdict form, the jury ultimately found that Marana had violated Aegis's right to both substantive due process and equal protection and awarded Aegis $428,199 in damages.  Marana then moved for a new trial pursuant to Rule 59(a)(6) and (8), Ariz. R. Civ. P., 16 A.R.S., Pt. 2, claiming "errors of law occurred at the trial and during the progress of this action, and the judgment is contrary to law."  After entering its final judgment, the trial court summarily denied Marana's new trial motion.  This appeal followed.

## DISCUSSION

### I.  Standing

¶16             Marana first argues the trial court erred in determining that Aegis had standing to bring this action.  In ruling on Marana's summary judgment motion, the trial court found that Aegis had standing, stating, "Aegis has at least an equitable interest in the property and has interest to fully develop the arguments."  Further, the trial court noted that Marana had "not been misled by the naming of Fetherling for Aegis."  The question of whether a party has standing to

7

sue is a question of law, and we review the trial court's standing determination de novo. *See Alliance Marana v. Groseclose*, 191 Ariz. 287, 289, 955 P.2d 43, 45 (App. 1997).

¶17    Marana maintains that the trial court's ruling was erroneous because "Aegis never owned the Property, nor was [it] denied the CUP, [and] it must prove it was specially damaged in order to have prosecuted this case." Marana further argues that Aegis did not prove any such special damages because "Aegis spent the bulk of its business start up money BEFORE Fetherling ever purchased the Property. This means that Aegis'[s] decision to try to get into the bio-medical waste business ha[d] nothing to do with Marana."

¶18    "Generalizations about standing to sue are largely worthless as such." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151, 90 S. Ct. 827, 829, 25 L. Ed. 2d 184, 187 (1970). Nonetheless, some oft-repeated principles serve to guide the determination of this issue. For example, to have standing, a plaintiff must have suffered "injury in fact, economic or otherwise." *Id.* at 152, 90 S. Ct. at 829, 25 L. Ed. 2d at 187. In addition, that injury must be "distinct and palpable," *Sears v. Hull*, 192 Ariz. 65, ¶16, 961 P.2d 1013, ¶16 (1998), such that the plaintiff has a "'personal stake in the outcome of the controversy.'" *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343, 354 (1975), *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663, 678 (1962).

¶19    In Arizona, "the question of standing . . . is not a constitutional mandate since we have no counterpart to the 'case or controversy' requirement of the federal constitution." *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs.*, 148 Ariz. 1, 6, 712 P.2d 914, 919 (1985). "Nonetheless, in addressing questions of standing, we are confronted with 'questions of prudential or judicial restraint,' and will impose that restraint to insure that 'the case is not moot and that the

8

issues will be fully developed by true adversaries.'" *Blanchard v. Show Low Planning & Zoning Comm'n*, 196 Ariz. 114, ¶19, 993 P.2d 1078, ¶19 (App. 1999), *quoting Armory Park*, 148 Ariz. at 6, 712 P.2d at 919 (citations omitted).

¶20 It is undisputed that Fetherling looked for, and eventually bought, property for the sole purpose of leasing it to Aegis so that, under his children's management, it could carry on its business there. The record is clear that although Fetherling and Aegis were separate and distinct, Fetherling had acted solely for Aegis's benefit when he purchased the Camino Martin property and eventually applied for a CUP. Indeed, on the CUP application, Fetherling stated that the use for which he requested permission was "office, storage, and processing area for medical waste unit." Because the Camino Martin property had been bought only for Aegis's use, Aegis was injured—for purposes of determining standing—when Marana denied Fetherling's CUP application and, as a result, denied Aegis the ability to conduct its business on the Camino Martin property. Based on this record, therefore, Aegis suffered distinct, palpable injury from, and had a personal stake in the outcome of any litigation over, Marana's denial of Fetherling's CUP application. *See Warth*; *Sears*.

¶21 The record is also clear that Marana knew that Fetherling essentially was acting as Aegis's agent when he applied for a CUP. For example, Marana addressed letters relating to the CUP application to "Dean Fetherling, Aegis of Arizona, LLC," and described the subject of one of the letters as "Conditional Use Permit for Aegis of Arizona, LLC." And, notices for and minutes of the Planning and Zoning Commission's February 24 and April 28 meetings and the May 18 Town Council meeting all identify Aegis as the applicant for the CUP. Therefore, despite Marana's assertion that its knowledge that Fetherling was acting on Aegis's behalf was

9

"immaterial," the record shows that even Marana, at least implicitly, acknowledged that Aegis was the real-party-in-interest as to the CUP application.

¶22        Thus, we agree with the trial court that Aegis had sufficient standing to bring this lawsuit. The cases on which Marana relies do not alter our conclusion. In the *Blanchard* case and *Buckelew v. Town of Parker*, 188 Ariz. 446, 937 P.2d 368 (App. 1996), property owners sued to invalidate zoning decisions relating to nearby or adjacent property. In both cases, Division One of this court noted that in order to have standing to challenge zoning decisions, a plaintiff must have suffered particular injury, not just general economic or aesthetic losses. *Blanchard*, 196 Ariz. 114, ¶20, 993 P.2d 1078, ¶20; *Buckelew*, 188 Ariz. at 450-51, 937 P.2d at 372-73. In those cases, however, the key question was whether the landowner-plaintiffs had been harmed by zoning decisions relating to nearby property owned by other individuals.

¶23        Here, in contrast, although Fetherling held legal title to the Camino Martin property, the sole reason he bought that property and applied for the CUP was to benefit Aegis. The harm Aegis allegedly suffered as a result of Marana's denial of the CUP application was more than merely a generalized economic loss—as was the case in *Blanchard*, where some of the plaintiffs argued that they had standing because they owned property in the town of Show Low, or because of their taxpayer status. 196 Ariz. 114, ¶12, 993 P.2d 1078, ¶12. Rather, Aegis suffered the particularized harm of being denied the ability to conduct its business on property that specifically had been bought for its use.

¶24        Finally, we find misplaced Marana's argument that by allowing Aegis to prosecute this lawsuit, the trial court "allowed Fetherling and Aegis to merge" and "allowed Aegis to recover for Fetherling's damages." On the contrary, once the trial court decided that Aegis had

10

standing, Marana's arguments that Aegis improperly sought to recover damages solely incurred by Fetherling were merely evidentiary in nature. Such evidentiary arguments are distinct from the standing issue and, even if preserved below and raised on appeal, cannot support Marana's challenge to Aegis's standing to bring this lawsuit.

## II. Finality of Shapiro's Initial Determination

¶25 Before addressing the rest of Marana's arguments on the merits, we next consider an issue Aegis raised below in motions for partial summary judgment and JMOL, and re-urges in its answering brief, relating to Shapiro's initial determination in December 1998. According to Aegis, Shapiro had the sole authority to make, and in December 1998 did make, a final, irreversible decision that Aegis's proposed use was permitted under the Camino Martin property's HI zoning without the need for a CUP. The trial court rejected that argument, finding "no evidence to support that the decision of the Planning Administrator was conclusively final or that it could not be changed by the Planning Commission or Town Council."[6] We consider Aegis's challenge of that ruling here because we may affirm on any ground supported by the record and, if Aegis's argument is correct, it might obviate the need to address Marana's arguments on the issue of liability. *See City of Tempe v. Outdoor Systems, Inc.*, 201 Ariz. 106, ¶14, 32 P.3d 31, ¶14 (App. 2001) (we may affirm even if trial court reached right result for wrong reason); *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶7, 965 P.2d 47, ¶7 (App. 1998) ("In order to avoid piecemeal litigation, . . . we may consider the merits of plaintiffs' cross-motion and direct entry

---

[6]Aegis later moved for reconsideration of this ruling, and, during trial at the close of all evidence, also orally moved for a "directed verdict" (JMOL) on this ground. The trial court denied both of those motions.

11

of summary judgment in their favor if they are entitled to that as a matter of law and there are no genuine issues of material fact precluding it.").

**¶26** As Marana correctly points out, Aegis did not file a cross-appeal. But Aegis did not have to do so in order to challenge the foregoing ruling. *See* Ariz. R. Civ. App. P. 13(b)(3), 17B A.R.S. ("The brief of the appellee may, without need for a cross-appeal, include in the statement of issues presented for review and in the argument any issue properly presented in the superior court."). Because Aegis unsuccessfully moved for summary judgment on this point, it preserved the issue for appeal. We "may affirm the judgment based on any such grounds," and a cross-appeal is required only if Aegis sought to enlarge its rights under the judgment or lessen Marana's. *Id.*; *see also* Ariz. R. Civ. App. P. 13 State Bar Committee Note (Absent a cross-appeal, we "may not alter the lower court's judgment in a manner favorable to the appellee."). The facts relating to this issue are essentially undisputed, and our review of the trial court's denial of Aegis's motions for partial summary judgment and JMOL is de novo. *See Bothell*, 192 Ariz. 313, ¶8, 965 P.2d 47, ¶8; *see also Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 505, 917 P.2d 222, 234 (1996).

**¶27** In ruling on Aegis's motion for partial summary judgment, the trial court accurately characterized Aegis's argument as follows:

> The gravamen of [Aegis's] claim in this case is that the Planning Administrator made a final decision that the planned use of the subject property was permitted. Nearly all counts of [Aegis's] complaint hinge on the proposed finality of this decision. Indeed, [Aegis] seeks summary judgment on the very basis that the Town of Marana failed to appeal the Planning Administrator's decision within the five-day period allowed for appeal. [Aegis's]

12

argument is based on what [it] claims was the exclusive power and duty of the administrator under MLDC § 02.04.01.[7]

The trial court then denied Aegis's motion, stating that Aegis's

> citation to the duties of the Planning Administrator at MLDC § 02.04 do not support the absolute finality of the Administrator's decision. The MLDC identifies [the] Planning Administrator's duties . . . as to review applications, issue certificates, and assist the Planning Commission. [Aegis] has not supported its argument that an oral decision was final as a matter of law. . . . [And, Aegis's] argument that [Marana] should have appealed the Planning Administrator's oral decision is erroneous because there was no such notice of such an event to begin the running of the five-day appeal period.

**¶28** As it did below, Aegis contends Shapiro's initial decision—that Aegis's proposed use was permitted without the need for any CUP—became final when Marana failed to appeal that decision within the time limit provided by the MLDC. *See* MLDC § 09.06.[8] Aegis further argues that by rejecting Shapiro's initial decision, requiring an application for a CUP, and eventually denying that application, Marana deprived Aegis of its "'property right'" under the MLDC to "use the property for the permitted use." According to Aegis, "[t]he backdoor politics which led to the requirement of a CUP in this case w[ere] illegal. The trial court should have ordered that Marana was liable as a matter of law[] and submitted only the issue of damages to the jury."

---

[7]MLDC § 02.04.01 sets forth the Planning Administrator's powers and duties, which include "[e]nforc[ing] the zoning provisions of this code." Aegis does not cite or rely on that section on appeal.

[8]The parties apparently agree that MLDC § 09.06, although not included in the record before us, states, in pertinent part: "Any decision of the Planning and Zoning Administrator . . . may be appealed to the Planning and Zoning Commission by filing written notice of such appeal with the Town Clerk no more than five (5) working days after the rendering of any such decision by the Planning and Zoning Administrator."

13

¶29 We find no merit to Aegis's argument, which is based primarily on Shapiro's testimony and the permissive authority granted to him under MLDC § 05.12.03(B)(9). *See* ¶5, *supra.* Viewed in the light most favorable to sustaining the judgment, portions of Shapiro's testimony and some letters by Marana staff might support a finding or inference that he had initially believed that his December 1998 oral decision was final. But we conclude as a matter of law, as did the trial court, that it was not.

¶30 First, Aegis's contention that Shapiro's initial decision became final when Marana failed to appeal it pursuant to MLDC § 09.06 is clearly untenable. The ordinance cannot reasonably be construed to require Marana to "appeal" an oral decision of one its own employees. *See State v. Estrada*, 201 Ariz. 247, ¶16, 34 P.3d 356, ¶16 (2001) (we cannot ascribe to a statute or ordinance an interpretation that would lead to unreasonable result).

¶31 Second, MLDC § 05.12.03(B)(9) merely authorized Shapiro to "permit any other uses *which may be determined* to be similar to those [expressly permitted HI uses] listed above, in conformity with the intent and purpose of this zone." (Emphasis added.) That section did not specify the person or body by whom that determination was to be made. And, contrary to Aegis's argument, that section did not give Shapiro the exclusive, unfettered authority to make a final, unreviewable determination that a non-listed but arguably similar use would be permitted in an HI zone.[9] If Shapiro had had such authority, the MLDC section that specifically prescribed the

_____

[9]We also note that MLDC § 05.12.03(D), labeled "Conditional Uses," authorized the Planning Administrator to "permit any other use which may be similar to those [expressly permitted HI uses] listed above, in conformity with the intent and purpose of this zone, *and not more obnoxious or detrimental to the public health, safety, welfare or to other uses permitted in this zone.*" (Emphasis added.) Despite the similarity in language between that section and MLDC § 05.12.03(B)(9), Aegis does not contend that Shapiro had the sole, unfettered authority to

Planning Administrator's powers and duties presumably would have so stated, but it did not. *See* MLDC § 02.04.01. In addition, MLDC § 02.04 provides a general description of the Planning Administrator's job and states that he or she "shall, *under the direction of the Town Manager*, be the primary administrative official for the administration of this code." (Emphasis added.) That section also supports the conclusion that any decision Shapiro made was subject to review and, as the trial court ruled, not "conclusively final."

¶32 Third, the state zoning enabling act also supports that conclusion. Because cities and towns derive their zoning power from the state enabling act, their local zoning ordinances must comply and be consistent with that act. *See Motel 6 Operating Ltd. P'ship v. City of Flagstaff*, 195 Ariz. 569, ¶8, 991 P.2d 272, ¶8 (App. 1999); *cf. City of Tucson v. Whiteco Metrocom, Inc.*, 194 Ariz. 390, ¶10, 983 P.2d 759, ¶10 (App. 1999) ("The City's power to enact zoning ordinances derives exclusively from the state."). Under A.R.S. § 9-462(A)(1), the board of adjustment is "the official body designated by local ordinance to hear and decide applications for variances from the terms of the zoning ordinance and appeals from the decision of the zoning administrator." Section 9-462.01(A)(3), A.R.S., further states that only the city's "legislative body" may "[r]egulate . . . the intensity of land use." Conversely, the enabling act limits the zoning administrator's authority to "enforcement of the zoning ordinance." § 9-462(A)(4). Therefore, although MLDC § 05.12.03(B)(9), viewed in isolation, appears quite broad, when viewed in light of the foregoing enabling statutes and other provisions in the MLDC, it did not

---

consider the factors set forth in § 05.12.03(D) or to make a final, unreviewable determination on whether conditional uses would be permitted in an HI zone, without any need to follow the specific procedures relating to conditional use permits prescribed in MLDC § 10.10.

grant Shapiro exclusive or final authority to ultimately decide whether certain uses were permitted within a particular zone.  *See Bateman v. City of West Bountiful*, 89 F.3d 704, 707 (10th Cir. 1996) (Under Utah's Municipal Land Use Code, which largely mirrors Arizona's, "the board of adjustment has the authority to make a final determination regarding [plaintiff's] property."); *cf. Murphy v. Town of Chino Valley*, 163 Ariz. 571, 572, 789 P.2d 1072, 1073 (App. 1989) (board of adjustment required CUP application after zoning administrator declared use was permitted).

¶33        In sum, we agree with the trial court that Shapiro's initial decision that Aegis's proposed use was permitted in the HI zone without the need for a CUP was not, as a matter of law, final.  Accordingly, we decline Aegis's invitation to affirm the judgment on that basis.

### III.  Denial of Marana's JMOL Motion

¶34        We next turn to Marana's various arguments that the trial court erred in denying its motion for JMOL. Based on several grounds, Marana contends the trial court erred by failing to grant that motion on Aegis's due process and equal protection claims.  Although Marana only appealed from the judgment, we nevertheless review the trial court's ruling on Marana's JMOL motion.  *See* A.R.S. § 12-2102(A) ("Upon appeal from a final judgment, [we] shall review any intermediate orders involving the merits of the action and necessarily affecting the judgment, and all orders and rulings assigned as error, whether a motion for a new trial was made or not.").  In reviewing that ruling, we view the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion, here, Aegis.  *See Monaco v. Healthpartners of S. Ariz.*, 196 Ariz. 299, ¶6, 995 P.2d 735, ¶6 (App. 1999).  And, we review a trial court's grant or denial of JMOL de novo.  *Id.*

16

## A. Exhaustion of Remedies

¶35    As noted in ¶12 above, before trial Marana moved for summary judgment on, inter alia, the ground that Aegis had failed to exhaust available administrative remedies when it did not appeal the March 16 decision that a CUP would be required. In ruling on that motion, the trial court agreed, stating,

> [t]he proper course would [have been] for [Aegis] timely to make its argument to the Planning Commission or Board of Adjustments, that is the Marana Town Council, pursuant to A.R.S. § 9-462.06, and MLDC [§]§ 09.06 and 02.03.02. There is no factual question that [Aegis] did not make such an appeal within five days of the March 16, 1999 letter requiring the CUP. That letter put [Aegis] on notice that the administrator's decision was different than [Aegis] had thought. Thus, this Court concludes that [Aegis] has failed to exhaust administrative remedies as to this issue.

The trial court went on to note that both the Planning and Zoning Commission and Marana's Town Council had addressed Fetherling's CUP application on its merits. Thus, the trial court concluded, "issues relating to [Aegis's] CUP application [and subsequent denial] have been exhausted, but issues related to the finality of the Planning Administrator's decision have not been exhausted." Accordingly, the trial court granted partial summary judgment in favor of Marana on its contention that Aegis had not exhausted available administrative remedies as to the March 16 decision to require the CUP.

¶36    The record reflects, and both parties acknowledged at oral argument, that the practical effect of that ruling was, at best, unclear during trial. Based on the trial court's exhaustion of remedies ruling, Marana consistently urged below that the court should preclude any evidence of Shapiro's initial determination and Marana's later decision to require a CUP. Although the trial court ruled before opening statements that Aegis "would be limited in that

17

regard, as set forth on the record,"[10] during trial the evidence to which Marana had objected was admitted. Only at the end of trial did the trial court clearly rule that Aegis's failure to exhaust administrative remedies would not preclude its § 1983 claims. And the trial court then denied Marana's proposed jury instructions that would have required the jurors to disregard any evidence of Marana's decision to require a CUP application from Aegis.

¶37        On appeal, Marana does not specifically assert any evidentiary or instructional error. Rather, it contends the trial court's "exhaustion ruling, as a matter of law, absolutely precluded Aegis'[s] 42 U.S.C. § 1983 claims." Marana also argues that "when the trial court ruled that Aegis failed to exhaust its administrative remedies by not appealing the Town's final administrative decision to require a CUP, the law of the case was that the Town's determination was legal. Thus, Aegis was precluded from challenging the CUP requirement at trial."

¶38        Generally, a party must exhaust administrative remedies before appealing to the courts. *See Minor v. Cochise County*, 125 Ariz. 170, 172, 608 P.2d 309, 311 (1980). As Aegis correctly notes, however, the United States Supreme Court has stated "there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action." *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 192, 105 S. Ct. 3108, 3119, 87 L. Ed. 2d 126, 142 (1985); *see also Zeigler v. Kirschner*, 162 Ariz. 77, 83, 781 P.2d 54, 60 (App. 1989). But, the Supreme Court also has observed that "[t]he question whether administrative remedies must be exhausted is conceptually distinct . . . from the question whether

---

[10]The record contains the trial court's minute entry but not the pertinent reporter's transcript relating to this ruling.

18

an administrative action must be final before it is judicially reviewable." *Williamson*, 473 U.S. at 192, 105 S. Ct. at 3119, 87 L. Ed. 2d at 142. Specifically,

> [w]hile the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Id.* at 193, 105 S. Ct. at 3120, 87 L. Ed. 2d at 142-43.

¶39 Thus, although exhaustion of available administrative remedies is not required in order to bring claims under § 1983, a decision must be final in order for it to be reviewable by a court in the context of a claim brought pursuant to that statute. If a decision does not "conclusively determine" an issue but, rather, "leaves open the possibility" that the decision is subject to change, then it is not final or ripe for review and cannot support a § 1983 claim. *Id.* at 193-94, 105 S. Ct. at 3120, 87 L. Ed. 2d at 143.

¶40 Here, the issue of the finality of Shapiro's initial, oral decision—that Aegis did not need a CUP—was raised by Aegis below and in its answering brief. And, in ¶¶29-33 above, we upheld the trial court's ruling that that decision, under the MLDC and state enabling statutes, was neither "conclusively final" nor unchangeable. Likewise, the later, written decision of Marana staff to require Aegis to apply for a CUP, memorialized in Shapiro's March 16 letter to Fetherling, also was not final; Aegis could and should have sought a final determination on that issue by the Planning and Zoning Commission or the Town Council. Such review would have

19

resulted in a conclusive determination whether Aegis would be required to apply for a CUP and would have enabled Aegis to properly seek judicial review of the CUP requirement.

¶41    In sum, neither Shapiro's initial determination that Aegis's proposed use was permitted and that no CUP was required, nor the later decision of Marana staff that a CUP would be required, were final, conclusive determinations. Given the lack of finality of those decisions, they were not ripe for judicial review. Although the trial court expressed its view during trial that evidence relating to the CUP requirement "go[es] to the issue of whether or not [the denial of the CUP was] arbitrary and capricious," we disagree. The propriety of the decision to require that Aegis apply for a CUP and the propriety of the ultimate decision on the merits of that CUP application are separate and distinct issues. Evidence relating to Shapiro's initial determination and Marana's subsequent decision to require a CUP was irrelevant to the Planning and Zoning Commission's denial of the CUP application on its merits.

¶42    The only issue that was ripe for trial was whether the facts surrounding Marana's denial of the CUP application supported Aegis's claims for violations of its substantive due process and equal protection rights. For several reasons, neither of those claims should have been submitted to the jury.

B.  Substantive Due Process

¶43    Marana argues that "the trial court erred by denying [its JMOL motion] as to the due process claim" because "Aegis'[s] primary complaint was that the Town's Planning Commission and Town Council were improperly swayed by negative press coverage and neighborhood opposition in denying the CUP" and because Aegis "failed to present sufficient facts to support a jury finding of liability on this claim." In reviewing this issue, we first note that "the

20

granting or the refusal to grant rezoning by special use permit is a legislative function of the Town Council subject to limited review by this Court." *Bartolomeo v. Town of Paradise Valley*, 129 Ariz. 409, 416, 631 P.2d 564, 571 (App. 1981). And, "[w]hen we review the action of a board of adjustment on appeal, we determine only if there is some credible evidence to support the board's ruling." *Burroughs v. Town of Paradise Valley*, 150 Ariz. 570, 573, 724 P.2d 1239, 1242 (App. 1986). We also note that the doctrine of substantive due process is "to be applied with 'caution and restraint.'" *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 430, 909 P.2d 486, 497 (App. 1995)*, quoting Moore v. East Cleveland*, 431 U.S. 494, 502, 97 S. Ct. 1932, 1937, 52 L. Ed. 2d 531, 539 (1977).

¶44 "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994). "A protected property interest is present where an individual has a reasonable expectation of entitlement deriving from 'existing rules or understandings that stem from an independent source such as state law.'" *Id.*, *quoting Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548, 561 (1972).

¶45 Again, because only Marana's final decision denying the CUP application was subject to review in connection with Aegis's substantive due process claim, it is clear that Aegis could not have had a "reasonable expectation of entitlement" to have the CUP application granted. Although Shapiro supported the CUP application and recommended its approval, no evidence in the record shows that anyone on either the Planning and Zoning Commission or town council had told Aegis that the CUP application would be approved. Thus, once the application for the CUP

21

was submitted, Aegis was subject to the inherently unpredictable and often politicized process of seeking permission from a local legislative body to conduct certain activity on a piece of property. In short, Aegis had no protected property interest in having its CUP application granted.

**¶46**        Moreover, even if we assume, arguendo, that Aegis did have a protectable interest in the granting of the CUP, its substantive due process claim still fails.  After determining that a party has a protectable property interest, the issue becomes, in the context of a § 1983 suit, whether any deprivation of that interest resulted from an abuse of governmental power of sufficient degree to be deemed a constitutional violation.  *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989).  In order to show a substantive due process violation, the abuse of governmental power must be one that "shocks the conscience."  *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 401 (3rd Cir. 2003) (holding that in the land-use context, substantive due process is violated only when government action "shocks the conscience"); *cf. County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (in context of search and seizure, substantive due process is violated only when the government's action shocks the conscience in a constitutional sense); *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, ¶6, 7 P.3d 136, ¶6 (App. 2000) (noting that substantive due process "precludes government conduct that shocks the conscience"); *Martin v. Reinstein*, 195 Ariz. 293, ¶66, 987 P.2d 779, ¶66 (App. 1999) (applying "shocks the conscience" standard in context of substantive due process claim challenging application of Sexually Violent Persons Act).

**¶47**        Aegis argues the record supports the jury's finding that Marana had violated its substantive due process rights because "[t]he evidence showed that neither neighborhood opposition nor concern for health and safety has anything to do with what Marana did.  Aegis was

22

politically railroaded by an illegal decision which served only one purpose, and that was to avoid the false and irresponsible media criticism of Marana." Aegis further contends that "[d]enying a property use for political reasons is a violation of substantive due process." On both points, we disagree.

¶48     The record shows that Marana put the issue of Aegis's proposed use on the agenda of its Planning and Zoning Commission's February 24 meeting in response to letters written by nearby property owners. Furthermore, the record shows that some of those property owners were at that meeting and voiced their concerns about the proposed use. People also expressed opposition to Aegis's proposed use at the April 28 Planning and Zoning Commission and May 18 Town Council meetings. There is no evidence in the record showing that Marana required the CUP solely because of the newspaper article concerning Aegis's proposed business. Even if it did, however, our conclusion would remain the same.

¶49     The law is clear that listening to public opposition to proposed land uses is part of the legislative process of rezoning. Indeed, "nothing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic . . . governments, operations which are permeated by pressure from special interests." *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988); *see also Christian Gospel Church v. San Francisco*, 896 F.2d 1221, 1225 (9th Cir. 1990) ("neighborhood opposition to the granting of a conditional use permit is not unlawful and should be considered by the Planning Commission"); *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 832 (1st Cir. 1982) ("that town officials are motivated by parochial views of local interests which work against plaintiffs' plan and which

23

may contravene state subdivision laws" does not state a claim of denial of substantive due process).

¶50 Even assuming all the evidence of Shapiro's initial determination and the subsequent decision of Marana staff to require a CUP was properly admitted, Aegis's constitutional claims relating to Marana's denial of the CUP fail as a matter of law. Courts repeatedly have held that a complaining landowner's substantive due process and equal protection rights are not violated even when a municipality acts in violation of state or local law, in bad faith, and/or beyond its jurisdiction. *See Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104 (8th Cir. 1991) (To state claim of violation of substantive due process, "the plaintiff must allege something more than that the government decision was arbitrary, capricious, or in violation of state law"; "[a]n example would be attempting to apply a zoning ordinance only to persons whose names begin with a letter in the first half of the alphabet."); *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 32 (1st Cir. 1991) ("without more," even if Puerto Rico "engaged in delaying tactics" or acted outside its jurisdiction, plaintiff could not state claims of violations of due process and equal protection); *Coniston Corp.*, 844 F.2d at 467 ("Something more is necessary than dissatisfaction with the rejection of a site plan to turn a zoning case into a federal case; and it should go without saying that the something more cannot be merely a violation of state (or local) law."); *Chiplin Enters., Inc. v. City of Lebanon*, 712 F.2d 1524, 1528 (1st Cir. 1983) ("A mere bad faith refusal to follow state law in such local administrative matters does not amount to a deprivation of due process."); *Creative Environments*, 680 F.2d at 833 (violation of state law, without more, cannot support claim of substantive due process violation; plaintiff must show "fundamental procedural irregularity, racial animus, or the like").

24

¶51 The cases on which Aegis relies in support of its assertion that "[d]enying a property use for political reasons is a violation of substantive due process," are inapplicable. In *Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir. 1988), evidence suggested that zoning was denied because of "indefensible reasons such as political animas." In *Bello v. Walker*, 840 F.2d 1124 (3rd Cir. 1988), evidence suggested that the permit application was denied because the applicant had publically opposed one council member's bid for reelection. In addition, *Bello* has been overruled. *See United Artists Theatre Circuit*, 316 F.3d at 394. Similarly, in *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983), evidence suggested that denial of the permit was based on racial considerations, and other evidence clearly showed that the permit denial was directed personally at the applicant. In contrast, the record here contains no evidence that denial of the CUP was based on any such impermissible personal, political, or racial considerations.

¶52 In sum, because it did not have a protected property interest in the granting of the CUP, Aegis's claim of substantive due process fails and should not have been sent to the jury. Moreover, even if Aegis did have such an interest, Marana, by considering public opposition to the proposed use, did not unconstitutionally deprive it of that interest. The trial court erred in denying Marana's JMOL motion on Aegis's substantive due process claim.

## C. Equal Protection

¶53 Marana also asserts "the trial court erred by denying [its JMOL motion] as to the equal protection claim" because "Aegis failed to show a single instance where a similarly situated applicant was treated differently by the Town from the way it was treated." Moreover, Marana argues, "[e]ven if there was a similarly situated class, the Town did not act arbitrarily or capriciously" in denying the CUP.

25

¶54    To establish an equal protection violation, a party must establish two facts. First, the party must show that it was treated differently than other people in the same "similarly situated" class. *Christian Gospel Church*, 896 F.2d at 1225. Second, when, as here, that disparate treatment does not "trammel[] fundamental personal rights or implicate[] a suspect classification," the party needs to show that the classification bears no rational relation to a legitimate state interest. *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990); *see also State v. Nguyen*, 185 Ariz. 151, 153, 912 P.2d 1380, 1382 (App. 1996).

¶55    The record does not reflect that Marana treated Aegis differently than other applicants for CUPs. No evidence established, nor does Aegis allege, that Marana had failed to follow applicable procedures in considering and denying the CUP application. The record shows that Aegis's proposed use generated significant public controversy within Marana, that Marana held duly noticed public hearings on the CUP application, and that Marana denied the application after considering all evidence for and against the CUP. The record does not show that Aegis was treated differently than any other developer seeking to conduct a controversial business within the town's borders.

¶56    Secondly, even if Marana had somehow treated Aegis differently in denying the CUP, the record shows that Marana had rational reasons for its decision. For example, although the Camino Martin property had HI zoning, Marana nonetheless had a legitimate interest in listening to its citizens and limiting the uses that occur in that zone. Indeed, although HI is the most permissive zone, there are some uses expressly prohibited in that zone. *See* MLDC § 05.12.03(E). Furthermore, the record shows that Aegis was unable to answer questions concerning how it was going to dispose of waste water generated by the JYD1500 as it processed

26

medical waste and whether the disposing of the JYD1500's waste water was going to be permitted by Pima County.

¶57      Therefore, as with Aegis's substantive due process claim, Aegis failed to establish facts upon which relief could be granted on its equal protection claim. Marana was entitled to JMOL on that claim, and the trial court erred in sending it to the jury.[11]

## DISPOSITION

¶58      The trial court erred in denying Marana's motion for JMOL on Aegis's substantive due process and equal protection claims. Accordingly, the trial court's judgment is reversed and the case is remanded with directions to enter judgment in favor of Marana. Aegis's request for fees incurred on appeal is denied.


_____
                                        JOHN PELANDER, Presiding Judge

CONCURRING:



_____
PHILIP G. ESPINOSA, Chief Judge



_____
PETER J. ECKERSTROM, Judge


_____

[11]In light of our conclusion that neither of Aegis's constitutional claims should have been sent to the jury, we need not address Marana's various challenges to Aegis's evidence of lost profits during trial.

27