265 P.3d 422

**Ryan COLEMAN and Laetitia Coleman, Appellants,**

v.

**CITY OF MESA, a municipal corporation; Mesa City Council, a body politic; Scott Smith, Mayor; Linda Crocker, City Clerk; Kyle Jones, Vice Mayor and City Council Member; Alex Finter, Dina Higgins, Dennis Kavanaugh, Dave Richins, Scott Somers, City Council Members, Appellees.**

**No. 1 CA–CV 10–0808.**

Court of Appeals of Arizona, Division 1, Department D.

Nov. 3, 2011.

242

244

Goldwater Institute By Clint Bolick, Carrie Ann Sitren, Phoenix, Kielsky, Rike & Elgart, P.L.L.C. By Michael Kielsky, Scottsdale, Attorneys for Appellants.

Mariscal, Weeks, McIntyre & Friedlander, P.A. By Scott A. Holcomb, Fredda J. Bisman, Erin R. Ford, Phoenix, Attorneys for Appellees.

1. We use the term "tattoo parlor" rather than "tattoo studio" or "tattoo art studio" to be consistent with terminology used in the Mesa City Code.

2. The "General Plan" is "[a] comprehensive plan ... providing for the future growth and improve-

## OPINION

TIMMER, Presiding Judge.

¶ 1 This appeal presents our first opportunity to consider the First Amendment rights of tattoo artists to ply their trade in Arizona. In doing so, we decide whether the superior court erred by dismissing a complaint filed by appellants Ryan and Laetitia Coleman (the "Colemans") against the City of Mesa and others (collectively, "Mesa") for denying the Colemans' request for a permit to operate a tattoo parlor within the city. We hold that obtaining a tattoo, applying a tattoo, and engaging in the business of tattooing are exercises of free speech entitled to protection as a fundamental right under the Arizona Constitution and the United States Constitution. As such, any restriction on that right must be highly scrutinized by our courts. Because the Colemans sufficiently alleged claims for violations of their free speech, equal protection, and due process rights, the superior court erred by dismissing the complaint without affording an opportunity to develop a factual record. We therefore reverse and remand for additional proceedings.

## BACKGROUND

¶ 2 Mesa requires some businesses, including pawn shops, tattoo parlors,[1] and body piercing salons, to obtain a Council Use Permit ("Permit") before operating in a commercially zoned area within the city. Mesa City Code, § 11–6–3(B) (2008). To obtain a Permit, a tattoo parlor, among other things, must be licensed as required by any state or county agency, must propose to operate in a location at least 1,200 feet from an existing tattoo parlor, body piercing salon, or school, and must "be compatible with surrounding uses, the General Plan,[2] and other recognized development plans or policies." Id. at § 11–6–3(B)(2), (4). Mesa's Planning and Zoning Board ("Board"), or a Planning Hearing Officer, reviews all requests for Permits and

ment of the City of Mesa, including the general location and coordination of streets and highways, schools and recreation areas, public building sites, and other physical development, including general land use patterns." Mesa City Code, § 9–6–1(C) (2011).

recommends disposition to the City Council ("Council"), which decides whether to grant requests and impose additional conditions as necessary to fulfill the provisions and intent of Mesa's zoning ordinance. *Id.* at §§ 11–6–3, 11–18–8(U)(2).

¶ 3 The Colemans are body artists who have owned and operated "Angel Tattoo," a successful tattoo parlor located for many years in Nice, France. They wish to open an American branch of their business in a Mesa strip shopping center that includes restaurants, a hair salon, a massage studio, and other small businesses in the Dobson Ranch neighborhood. In July 2008, the Colemans initiated the preliminary review process for obtaining a Permit and formally applied for the Permit the following January. The Board's staff reviewed the application, found the Colemans in compliance with Permit requirements imposed by the City Code, and recommended issuance of a Permit with conditions.[3] The Board reviewed the Colemans' application and staff recommendations at a February 2009 meeting and ultimately voted 3–2 to urge denial of the application, voicing concerns that a tattoo parlor was not "appropriate" for the neighborhood. In March, the Council considered the application and heard from both proponents and opponents at a public meeting. Opponents presented no evidence but articulated concerns that a tattoo parlor in the suggested location might draw crime to the area and reduce property values. The Council voted 6–1 to deny the Permit application.

¶ 4 The Colemans sued Mesa in March 2010, alleging violations of their civil rights guaranteed under the state and federal constitutions and seeking declaratory and mandamus relief as well as monetary damages under 42 U.S.C. § 1983. Mesa filed a motion to dismiss the complaint pursuant to Arizona Rule of Civil Procedure ("Rule") 12(b)(6) in June, arguing the complaint failed to state a claim on which relief could be granted.[4] After briefing and oral argument, the superior court granted the motion, concluding the Council's decision "was a reasonable and rational regulation of land use." This timely appeal followed.

## DISCUSSION

¶ 5 Motions to dismiss test a complaint's legal sufficiency. *Moretto v. Samaritan Health Sys.,* 190 Ariz. 343, 346, 947 P.2d 917, 920 (App.1997). Dismissal is warranted when the complaint fails to allege sufficient facts to support a legal claim. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). The superior court properly dismisses a complaint only when it can be certain the plaintiff cannot prove facts entitling it to relief. *Fid. Sec. Life Ins. Co. v. State, Dep't of Ins.,* 191 Ariz. 222, 224, ¶ 4, 954 P.2d 580, 582 (1998) (stating that dismissal for failure to state a claim is appropriate only if "as a matter of law ... plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof"). As a general policy, "[m]otions to dismiss for failure to state a claim are not favored under Arizona law...." *State ex. rel. Corbin v. Pickrell,* 136 Ariz. 589, 594, 667 P.2d 1304, 1309 (1983).

¶ 6 We review the grant of a motion to dismiss for an abuse of discretion. *Dressler v. Morrison,* 212 Ariz. 279, 281, ¶ 11, 130 P.3d 978, 980 (2006). "A trial court abuses its discretion when it misapplies the law or

---

**3.** The Board staff recommended that Angel Tattoo take steps to limit loitering around the business, restrict its business days and hours, refuse to serve anyone under the age of 18, check the identification of anyone appearing under the age of 25, cooperate with Mesa police to identify known gang tattoos, refuse to apply gang or racist tattoos, and withhold services from anyone who appears under the influence of drugs or alcohol. The Colemans agreed to abide by these conditions.

**4.** Although Mesa attached relevant parts of its City Code and minutes from the Council's April

2009 meeting to its motion, and the court relied on these documents in its ruling, because the documents were public records the court properly treated the motion as one to dismiss under Rule 12(b)(6) rather than one for summary judgment under Rule 56. *Strategic Dev. & Constr., Inc. v. 7th & Roosevelt Partners, LLC,* 224 Ariz. 60, 64, ¶ 13, 226 P.3d 1046, 1050 (App.2010) (holding that "a Rule 12(b)(6) motion that presents a document that is a matter of public record need not be treated as a motion for summary judgment").

predicates its decision on incorrect legal principles." *State v. Jackson*, 208 Ariz. 56, 59, ¶ 12, 90 P.3d 793, 796 (App.2004). We review constitutional law issues underlying the motion de novo. *State v. Ramsey*, 211 Ariz. 529, 532, ¶ 5, 124 P.3d 756, 759 (App.2005). We accept as true all well-pleaded facts stated in the complaint and resolve inferences in favor of the plaintiff. *Sw. Paint & Varnish Co. v. Ariz. Dep't of Envtl. Quality*, 191 Ariz. 40, 41, 951 P.2d 1232, 1233 (App.1997), *approved in part*, 194 Ariz. 22, 976 P.2d 872 (1999).

¶ 7 The Colemans allege in their complaint that they are entitled to relief because the Council violated their state and federal constitutional rights to engage in free speech, receive equal protection under the law, and be afforded substantive due process. We address each basis in turn.

## A. Free speech

¶ 8 The Colemans assert Mesa violated their state and federal free-speech rights to operate a tattoo parlor in the Dobson Ranch neighborhood because Mesa City Code § 11-6-3(B), as applied to the Colemans, was not a reasonable time, place, or manner restriction. They argue the superior court erred by granting the motion to dismiss because the sufficiency of their complaint can be assessed only after development of a factual record. Mesa counters that the act and business of tattooing are not free-speech rights and, consequently, the court properly applied a rational basis standard of review to test the propriety of Mesa's permitting process and decision on the Colemans' application. Alternatively, Mesa contends that if the act and business of tattooing are protected speech rights, the permitting process and the Council's decision survive the required heightened level of scrutiny. The superior court ruled in

favor of Mesa, reasoning that the "Council's finding that it would be appropriate and in the best interest of the community to deny the Application to establish a tattoo parlor at this location was a reasonable and rational decision based upon community concerns."

¶ 9 To determine whether the Colemans state a sufficient claim against Mesa for violating their free-speech rights, we initially must decide whether engaging in the act and business of applying tattoos is such a right guaranteed by the state or federal constitutions.[5] Resolution of that issue will supply the appropriate legal framework to assess whether the Colemans' complaint states a cognizable claim.

¶ 10 Article 2, Section 6, of the Arizona Constitution, provides, "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." The First Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech, or of the press." *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). Although our supreme court has held that Article 2, Section 6 affords greater protection to speech than the First Amendment, *State v. Stummer*, 219 Ariz. 137, 143, ¶ 17, 194 P.3d 1043, 1049 (2008); *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 354–55, 773 P.2d 455, 459–60 (1989), neither party contends the state provision *defines* protected speech differently than the First Amendment. Indeed, our court has applied case law developed under the First Amendment to determine whether activity constitutes protected speech under the state constitution.[6] *See Bird v. State*, 184 Ariz. 198, 202 n. 2, 204, 908 P.2d 12, 16 n. 2, 18 (App.

---

5. The superior court's position on this issue is unclear. At the hearing, the court stated it would assume that the act and business of tattooing are protected under the free speech provisions of the state and federal constitutions. In its written ruling, however, the court did not apply the heightened standard of review associated with the alleged violation of a constitutional right.

6. Article 2, Section 6 is based on the free speech provision of the Washington Constitution.

*Mountain States*, 160 Ariz. at 355, 773 P.2d at 460. In considering whether an activity constitutes protected speech under the Washington Constitution, the Washington Court of Appeals likewise applied First Amendment case law. *City of Seattle v. McConahy*, 86 Wash.App. 557, 567, 937 P.2d 1133, 1139 (1997) (applying First Amendment cases to decide that sitting on a public sidewalk is not protected speech under the state constitution in the particular facts of the case).

1995) (deciding that betting on election outcome is not protected speech). We do the same.

▇▇▇ ¶ 11 Constitutionally protected speech encompasses both "pure speech," which comprises inherently expressive activities like writing and speaking,[7] and expressive or symbolic conduct, such as voting,[8] nude dancing,[9] wearing a black armband at school to protest government action,[10] using public streets to picket,[11] and displaying an American flag with a peace symbol affixed.[12] "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas v. Johnson*, 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Consequently, restrictions on pure speech survive First Amendment scrutiny only if the government regulation is a reasonable "time, place, or manner" restriction. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Government restrictions of expressive conduct, however, are subject to the less stringent test announced in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which permits a restrictive regulation

if it "[1] is within the constitutional power of the Government; . . . [2] furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058–59 (9th Cir.2010) (noting *O'Brien* test is less stringent than "time, place, or manner" test). Our decision in this appeal thus starts with deceptively simple questions: Are the act and the business of tattooing a human being pure speech or conduct? If the latter, is the conduct expressive or non-expressive?

¶ 12 During the relatively brief lifespan of tattoo jurisprudence, most courts addressing the issue have held that the process of tattooing is conduct without an expressive component and therefore is not entitled to protection under the First Amendment.[13] The reasoning in *Hold Fast Tattoo, LLC v. City of North Chicago*, 580 F.Supp.2d 656 (N.D.Ill.2008), is illustrative of these cases. In *Hold Fast*, a business sought a special use

---

7. *See, e.g., Bigelow v. Virginia*, 421 U.S. 809, 817–18, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (describing newspaper advertisement as "pure speech"); *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (characterizing verbal comment at public rally as "pure speech"). Not all spoken and written words are protected by the First Amendment, however. For example, the First Amendment does not secure a right to use fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), engage in obscenity, *Roth v. United States*, 354 U.S. 476, 481–85, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), incite violence, *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), or defame others, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345–48, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See also Bigelow*, 421 U.S. at 819, 95 S.Ct. 2222 (listing categories of speech held unprotected).

8. *Citizens United v. Fed. Election Comm'n*, —— U.S. ——, 130 S.Ct. 876, 948 n. 52, 175 L.Ed.2d 753 (2010) (Stevens, J., concurring in part, dissenting in part).

9. *Compare City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (concluding that "[b]eing 'in a state of nudity' is not an inherently expressive condition" but nude

erotic dancing is expressive conduct entitled to First Amendment protection), *with City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (holding social dancing not protected by First Amendment as a "kernel of expression" is insufficient to bestow this status).

10. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

11. *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (acknowledging that patrolling, marching, and picketing constitute conduct protected by the First Amendment).

12. *Spence v. Washington*, 418 U.S. 405, 414–15, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

13. *See Hold Fast Tattoo, LLC v. City of N. Chicago*, 580 F.Supp.2d 656, 659–61 (N.D.Ill.2008); *Riggs v. City of Fort Worth*, 229 F.Supp.2d 572, 580–81 (N.D.Tex.2002); *Yurkew v. Sinclair*, 495 F.Supp. 1248, 1253–55 (D.Minn.1980); *State v. White*, 348 S.C. 532, 560 S.E.2d 420, 423–24 (2002); *State ex rel. Med. Licensing Bd. v. Brady*, 492 N.E.2d 34, 39 (Ind.Ct.App.1986); *People v. O'Sullivan*, 96 Misc.2d 52, 409 N.Y.S.2d 332, 333 (N.Y.App. Term 1978).

permit to operate a tattoo parlor within North Chicago but was rejected because the city council did not want the city to have that "kind of business." *Id.* at 658. The business sued to challenge the decision on several constitutional bases, and the district court dismissed the complaint for failing to state a legal claim. *Id.* at 663. In determining whether the First Amendment protects the act of tattooing, the court initially concluded, without analysis, that tattooing is "conduct" rather than "speech." *Id.* at 659. It then applied the test enunciated in *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), to determine whether tattooing is " 'sufficiently imbued with elements of communication to fall within the scope' of the First Amendment." *Hold Fast,* 580 F.Supp.2d at 659 (citing *Spence,* 418 U.S. at 409, 94 S.Ct. 2727). Conduct is "sufficiently imbued" with communicative elements if it evidences (1) an intent to convey a particularized message that (2) likely would be understood as a message by those who view it. *Spence,* 418 U.S. at 409–11, 94 S.Ct. 2727. The *Hold Fast* court reasoned that tattooing fails the *Spence* test because the act is not intended to convey a particularized message:

> The very nature of the tattoo artist is to custom-tailor a different or unique message for each customer to wear on the skin. The act of tattooing is one step removed from actual expressive conduct, which is similar to a sound truck, which enables each customer to express a particularized message, but the sound truck vehicle itself is not expressive.... Similarly, the tattoo artist's daily work may be used by customers to convey a message, but it is not protected by the First Amendment in and of itself. Because the act of tattooing fails the first prong of the test for First Amendment protection, there is no "message" to be understood by viewers and tattooing must also fail the second prong.

580 F.Supp.2d at 660; *see also Yurkew,* 495 F.Supp. at 1254 (stating "there has been no showing that the normal observer or even the recipient would regard the process of injecting dye into a person's skin through the use of needles as communicative"); *White,* 560 S.E.2d at 423 ("Appellant has not made any showing that the *process* of tattooing is communicative enough to automatically fall within First Amendment protection.... Unlike burning the flag, the process of injecting dye to create the tattoo is not sufficiently communicative to warrant protections ...."). Mesa urges us to follow *Hold Fast* and like cases.

¶ 13 The Colemans ask us to follow the Ninth Circuit's decision in *Anderson v. City of Hermosa Beach,* 621 F.3d 1051, 1060 (9th Cir.2010), and hold that the act and business of tattooing constitute pure speech under the First Amendment. In deciding that the City of Hermosa Beach's ban on tattoo parlors violated the First Amendment, the *Anderson* court departed from the "conduct" analysis used in the *Hold Fast* line of cases and instead concluded that tattooing is purely expressive activity and therefore entitled to the fullest protection afforded by the First Amendment. *Anderson,* 621 F.3d at 1059. To reach this conclusion, the court analogized tattoos to various forms of visual expression, such as dance, movies, parades, and paintings, which have been given full constitutional protection without being characterized as "conduct." *Id.* at 1060. The court then extrapolated that the process of tattooing is pure speech because the process necessarily conveys a message. *Id.* at 1061 (noting courts have never "drawn a distinction between the process of creating a form of *pure* speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded"). Finally, the court concluded that because the sale of the tattoo is intertwined with the process of creating it, the business of a tattoo parlor is also pure speech subject only to reasonable time, place, or manner restrictions. *Id.* at 1063.

¶ 14 Identifying pure speech outside the spoken and written word can be difficult and may tempt a court to apply an I–know–it–when–I–see–it test. From our review of cases, however, we glean that "pure speech" is characterized by an inherent expressiveness that extends beyond oral and written communication to any medium whose dominant function is expression of a thought,

emotion, or idea.[14] Following this general principle, we agree with *Anderson* that tattoos constitute "pure speech" and are therefore entitled to full protection under the First Amendment. The sole purpose of a tattoo is to communicate thoughts, emotions, or ideas as rendered by the tattoo artist. As such, we do not discern a meaningful difference between, for example, Salvador Dali's "The Persistence of Memory," which clearly constitutes pure speech, and a tattoo of melting clocks merely because the former is painted on canvas while the latter is inked on a bicep. *See Anderson*, 621 F.3d at 1061 ("[A] form of speech does not lose First Amendment protection based on the kind of surface it is applied to."). We hold that tattoos applied to an individual[15] are a form of pure speech subject to the highest level of protection under Article 2, Section 6, of the Arizona Constitution and the First Amendment.

¶ 15 We likewise agree with the *Anderson* court that the process and business of tattooing fall within the category of pure speech rather than conduct. Tattoos are applied by needles through an electrically powered tattoo machine, often called a tattoo "gun." *Anderson*, 621 F.3d at 1055. The needle punctures the skin between 50 and 3,000 times per minute to deposit insoluble ink into the skin's dermis layer to form the design or image. *Id.* at 1055–56. According to the Colemans' complaint, tattoos require

skilled professional artists to "engage in creative expression and provide the means of expression to those who patronize their services." *See also* Hoag Levins, *The Changing Cultural Status of the Tattoo Arts in America*, Tattoo Arts in Am., http://www.tattooartist.com/history.html (last visited Nov. 1, 2011) (stating the finished tattoo can be chosen from a pre-designed image or be the subject of a "custom, fine art design"). As the *Anderson* court observed, the process of creating a tattoo cannot be segregated from the tattoo itself for purposes of free speech as the process and product are so entwined that the protection afforded the process necessarily applies to the product. 621 F.3d at 1062; *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (holding use tax on cost of newspaper ink and paper violated First Amendment by imposing significant burden on publication of newspaper). Unlike the sound truck example given by the *Hold Fast* court, the process of tattooing does not merely amplify and distribute pure speech; it *creates* pure speech. *See Anderson*, 621 F.3d at 1062 ("[T]he tattoo cannot be created without the tattooing process any more than the Declaration of Independence could have been created without a goose quill, foolscap, and ink."). As such, the act of tattooing is entitled to the same status as the tattoo itself.

14. *See Ward*, 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L.Ed.2d 661 (acknowledging that music, as a form of expression and communication, is protected by First Amendment); *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (stating painting, music, and poetry are "unquestionably shielded" by First Amendment); *Schad v. Mount Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (holding motion pictures, radio and television programs, and live entertainment are protected by First Amendment); *Kaplan v. California*, 413 U.S. 115, 119–20, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) (acknowledging "pictures, films, paintings, drawings, and engravings" as mediums of expression); *Cohen v. California*, 403 U.S. 15, 18, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (stating in essence that pure speech, as opposed to expressive conduct, necessarily conveys a message); *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir.1996) (noting "paintings, photographs, prints and sculptures ... always communicate some

idea or concept to those who view it, and as such are entitled to full First Amendment protection" while jewelry, pottery and silver crafts only do so sometimes); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 96–97 (2d Cir.2006) (holding original graffiti-applied clothing goods serve predominantly expressive purpose and sale of goods therefore subject to First Amendment protection); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir.2003) (stating that First Amendment protection extends to music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures); *Piarowski v. Ill. Cmty. Coll. Dist. 515*, 759 F.2d 625, 628–32 (7th Cir.1985) (holding stained glass windows protected under First Amendment).

15. We do not address the tattooing of animals or the application of tattoos as "permanent make-up," as they are not at issue here. Moreover, no one possesses a constitutional right to tattoo someone against that person's will.

¶ 16 Finally, because tattoos and the act of tattooing are pure speech, it follows that the business of tattooing—the "sale" of tattoos—also constitutes pure speech. As the *Anderson* court pointed out, the sale of a tattoo is inseparable from the tattoo itself as its creation depends on the prospective bearer's willingness to collaborate with the tattoo artist and pay for it. *Id.* at 1063 (citing *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 801, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak.")). Just as the sale of newspapers and works of art are entitled to the full protection afforded by the First Amendment, the sale of tattoos must be afforded the same protection. *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 756 n. 5, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[T]he degree of First Amendment protection is not diminished merely because the [protected expression] is sold rather than given away."); *see also Bery,* 97 F.3d at 695–96 (holding sale of artwork is expression protected to the fullest extent by First Amendment).

¶ 17 In sum, we hold that a tattoo, the act of tattooing, and the business of tattooing constitute pure speech entitled to the highest level of protection by Article 2, Section 6, of the Arizona Constitution and the First Amendment to the United States Constitution. Accordingly, we need not apply the *Spence* test to determine whether these activities constitute protected expressive conduct. Instead, now that we have identified tattooing as pure speech subject only to reasonable time, place, or manner restrictions by government, we consider whether the Colemans sufficiently stated a claim that Mesa violated their free-speech rights.

¶ 18 Government restrictions on free speech are scrutinized differently depending on whether the restriction is content-based or content-neutral. *State v. Evenson,* 201 Ariz. 209, 212, ¶ 13, 33 P.3d 780, 783 (App.2001). The parties each contend that Mesa's ordinance and permitting process is content-neutral, and the record before us supports this conclusion. *See Sorrell v. IMS Health Inc.,* —— U.S. —— 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011) (noting regulations are content-neutral if they are justified without reference to the content of regulated speech). As such, Mesa's ordinance and permit process are subject to intermediate scrutiny, which requires the court to determine if Mesa imposed a permissible time, place, or manner restriction on the Colemans' operation of a tattoo parlor within the city. *Anderson,* 621 F.3d at 1064. Government may impose reasonable time, place, or manner restrictions on protected speech provided these restrictions (1) are "justified without reference to the content of the regulated speech," (2) are "narrowly tailored to serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the information." [16] *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (citing *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)); *cf. City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (stating "so-called 'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication").

¶ 19 The Colemans argue the superior court erred by dismissing their complaint

---

16. Our supreme court has departed from the federal test when measuring the constitutionality of *content-based* secondary effects regulations under Article 2, Section 6, of the Arizona Constitution in light of the broader protection provided by the state provision. *Stummer,* 219 Ariz. at 144, ¶¶ 23–24, 194 P.3d at 1050. Almost twenty years before its holding in *Stummer,* the court applied essentially the federal test to a *content-neutral* time, place, or manner regulation. *Salib v. City of Mesa,* 212 Ariz. 446, 454, ¶ 27, 133 P.3d 756, 767 (App.2006) (citing *Mountain States,* 160

Ariz. at 357–58, 773 P.2d at 462–63). Neither party contends we should apply a different test under the Arizona Constitution to examine content-neutral time, place, or manner regulations, like the Mesa ordinance at issue in this case. Because we conclude the superior court incorrectly dismissed the Colemans' complaint under the First Amendment test, we need not address whether a different test is required under the Arizona Constitution, which provides greater protection to free speech.

because "there is a gaping factual issue" whether Mesa's application of its ordinance is narrowly tailored to achieve its legitimate interests. Mesa counters it has a legitimate interest in planning and regulating the use of commercial property and points out that, unlike the City of Hermosa Beach in *Anderson,* Mesa does not ban tattoo parlors but merely controls their locations. According to Mesa, it denied the Colemans' application to operate in Dobson Ranch because a tattoo parlor at that location would be incompatible with the neighborhood.

¶ 20 The Colemans sufficiently state a claim that Mesa did not narrowly tailor application of its ordinance to achieve its legitimate interest in controlling the locations of tattoo parlors. *See Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 62, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ("[W]e have no doubt that the municipality may control the location of ... commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city."). They allege in their complaint that Board staff, in recommending issuance of the Permit, found that the proposed tattoo parlor conformed with Mesa's general plan and policies, would be compatible with and not detrimental to the neighborhood, and would not damage property values. Staff additionally related that the police department had reported no increase in crimes attributable to a similarly situated tattoo parlor. Finally, Staff proposed restrictions on the Permit to counter perceived "secondary effects" of tattoo parlors, *see supra* note 3, which the Colemans embraced. Proof of these allegations may demonstrate that the Council's application of Mesa City Code § 11–6–3(B) to deny a Permit under any conditions was too sweeping in achieving Mesa's legitimate land use planning goals. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,* 657 F.3d 936, 947–48 (9th Cir.2011) (noting narrowly tailored

regulation must "focus[ ] on the source of the evils the city seeks to eliminate ... and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils" (citations omitted)).

¶ 21 The Council minutes attached to the motion to dismiss do not evidence that the Colemans would be unable to demonstrate that Mesa could have achieved its goals by granting the Permit with recommended restrictions. Mesa relies on concerns expressed by neighbors at the Council meeting that crime rates and neighborhood property values would be negatively affected if a tattoo parlor operated at the Dobson Ranch location. As Mayor Smith stated during the meeting, however, the Council "has not heard any evidence that the tattoo business is detrimental to a neighborhood other than the perception." Although we agree with Mesa it can appropriately consider citizens' viewpoints in deciding whether a commercial business is appropriately located in a particular neighborhood, *see Aegis of Ariz., L.L.C. v. Town of Marana,* 206 Ariz. 557, 569, ¶ 49, 81 P.3d 1016, 1028 (App.2003), we do not agree Mesa can constitutionally deny a Permit for a tattoo parlor, thereby restricting the exercise of free expression, based solely on neighborhood hostility born from perceptions about tattoo parlors that may or may not be accurate.[17] If this was permitted, unpopular speech could be silenced easily under the guise of land use planning. *See generally In re Volunteers of Am., Inc.,* 749 P.2d 549, 552 (Okla.1988) (holding board arbitrarily denied request for equivalent to special use permit for prison pre-release center because decision based on negative perceptions rather than actual evidence of injurious effect). Land-use decisions by government that impact the free exercise of speech must be premised on sufficient facts rather than hostile public perceptions concerning the ex-

17. For this reason, we disagree with the superior court's ruling that Mesa's decision was reasonable "based upon community concerns." The record before the court was unlike that in *Young,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310, which the court relied on in its ruling. In *Young,* the "record disclosed a factual basis," including opinions of urban planners and real estate experts, demonstrating that Detroit's restrictions on locations for adult theatres were needed to avoid injuring neighborhoods. *Id.* at 54–55, 71, 96 S.Ct. 2440. By dismissing the Colemans' complaint, the court prevented development of the type of factual record underlying the *Young* decision, which is required in this case for free speech analysis.

ercise of that constitutional right. *State v. Boehler*, 228 Ariz. 33, ¶ 23, 262 P.3d 637 (App.2011) ("Our constitution does not permit government to restrict speech in a public forum merely because the speech may make listeners uncomfortable.").

¶ 22 The Colemans may also show that Mesa failed the "narrowly tailored" requirement by demonstrating that Mesa City Code § 11–6–3(B) fails to sufficiently guide or limit the discretion of the Council. A time, place, or manner restriction does not fulfill the "narrowly tailored" requirement for constitutionally protected speech if it bestows unbridled discretion on government officials to grant or deny a permit or license. *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 613 (9th Cir.1993); *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 70, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone . . . ." (citation omitted)); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."); *Wortham v. City of Tucson*, 128 Ariz. 137, 140–41, 624 P.2d 334, 337–38 (App.1980) (requiring "definite, objective guidelines" for a public official to use when an activity protected by the First Amendment is subject to licensing). Mesa City Code § 11–6–3(B) conditions issuance of a Permit on a tattoo parlor's "compatib[ility] with surrounding uses, the General Plan, and other recognized development plans or policies." The record before us does not reveal any evidence concerning what, if anything, guided the Council's discretion in making this compatibility decision;[18] the Colemans should be permitted to probe this issue.

¶ 23 We are also unable to conclude as a matter of law that Mesa's decision left open ample alternative opportunities for the Cole-

mans to exercise their free-speech rights. *Ward*, 491 U.S. at 791, 109 S.Ct. 2746. As they contend, if Mesa is able to deny a Permit application based solely on negative perceptions about tattoo parlors, or Mesa's discretion in determining neighborhood compatibility is unguided, the Colemans cannot practically determine where to properly locate within Mesa. If they wish to operate a tattoo parlor in Mesa, they must expend time and possibly money to find and arrange for a new location, which Mesa may or may not deem "compatible" with the neighborhood despite compliance with other criteria of § 11–6–3(B). If denied a Permit, the Colemans' only choice is to repeat the process at a new location. To comply with free speech principles, an alternative for communication must permit the Colemans to obtain a Permit without incurring unreasonable costs of time or money that dissuade them from operating in Mesa. *See City of Ladue v. Gilleo*, 512 U.S. 43, 56–57, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (holding city ban on residential signs with enumerated exceptions not reasonable time, place, or manner restriction because, among other things, alternative methods of communication were more costly in terms of time or money and "may make the difference between participating and not participating in some public debate.").

¶ 24 In sum, the Colemans sufficiently allege that Mesa failed to narrowly tailor its Permit decision to further its legitimate interests and that the decision failed to leave open ample alternative means for the Colemans to operate a tattoo parlor in Mesa. The Colemans must be permitted to explore these issues through discovery and development of a factual record. *See Stummer*, 219 Ariz. at 146, ¶ 35, 194 P.3d at 1052 (noting that because case decided on motion to dismiss, "the record contains no evidence of the significance of the infringement on speech, the effectiveness of the statute in reducing negative secondary effects, the nexus between the ends sought and the means employed, or the

---

18. The Council minutes state, "Mayor Smith questioned the subjective manner in which the Council approaches the process for Council Use Permits, and he suggested that the decision was likely to be based on emotions and perceptions rather than the legality of the business. . . . [He] recommended that the standards be raised and that judgments be based on facts rather than perceptions."

availability of alternative measures"). Consequently, the superior court erred by dismissing the Colemans' claims under Article 2, Section 6, of the Arizona Constitution and the First Amendment to the United States Constitution.

### B. Equal protection

¶ 25 The Colemans next argue the superior court erred by dismissing the claim that Mesa violated their state and federal equal protection rights [19] by requiring tattoo parlors to obtain Permits under conditions not imposed on other commercial enterprises. Mesa's responsive arguments turn on its contention that engaging in the business of tattooing is not a free-speech right, a contention we reject today, *see supra* part A. Our determination that tattooing constitutes the exercise of free speech guides our resolution of the Colemans' equal protection argument.

¶ 26 The free-speech guarantees of our state and federal constitutions are fundamental rights. *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (acknowledging that free speech is a "fundamental right"). Consequently, if Mesa City Code § 11–6–3(B) "substantially burdens" these rights, the provision can withstand the Colemans' equal protection challenge only under a strict scrutiny analysis. *Big D Constr. Corp. v. Court of Appeals*, 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990); *see also Regan*, 461 U.S. at 547, 103 S.Ct. 1997. Under that analysis, Mesa bears the burden of showing that Mesa City Code § 11–6–3(B) is narrowly drawn to further a compelling government interest, which outweighs the Colemans' free-speech interests. *Martin v. Reinstein*, 195 Ariz. 293, 309, ¶ 51, 987 P.2d 779, 795 (App.1999) (citing *M.L.B. v. S.L.J.*, 519 U.S. 102, 114 n. 6, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996)).

¶ 27 The Colemans sufficiently state a claim for an equal protection violation by asserting that Mesa disparately treats tattoo parlors based on unfounded perceptions and stereotypes. Because the Colemans are capable of proving that Mesa City Code § 11–6–3(B) "substantially burdened" their free-speech rights, Mesa bears the burden of demonstrating that the provision is narrowly drawn to achieve a compelling government interest, which outweighs the Colemans' protected interests. *Id.* As previously explained, *see supra* ¶¶ 20–22, the slim record supporting the motion to dismiss fails to identify Mesa's interests or demonstrate that the Code provision is narrowly tailored to achieve those interests. For this reason, a factual record is needed in order to assess the Colemans' equal protection claim, and the court therefore erred by dismissing it as legally insufficient. In light of our decision, we need not address the parties' additional arguments concerning equal protection.

### C. Due process

¶ 28 The Colemans finally argue the superior court erred by dismissing their claim that Mesa violated their state and federal substantive due process rights [20] because Mesa's "planning and zoning code approval criteria," facially and as applied, did not sufficiently guide the Council's discretion, the Council's decision was based on perception rather than fact, and the Council acted unfairly.

¶ 29 Substantive due process under both the Arizona Constitution and the United States Constitution "provides heightened protection against government interference with certain fundamental rights," including free-speech rights. *Standhardt v. Superior Court*, 206 Ariz. 276, 280, ¶ 11, 77

---

19. *See* Ariz. Const. art. 2, § 13 ("No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."); U.S. Const. amend. XIV, § 1 ("No State shall ... deny to any person within its jurisdiction the equal protection of the laws."). The Arizona provision provides the same benefits as its federal counterpart. *Standhardt v. Superior*

*Court*, 206 Ariz. 276, 289, ¶ 42 n. 19, 77 P.3d 451, 464 n. 19 (App.2003).

20. *See* Ariz. Const. art. 2, § 4 ("No person shall be deprived of life, liberty, or property without due process of law."); U.S. Const. amend. XIV, § 1 ("No State shall ... deprive any person of life, liberty, or property, without due process of law ....").

P.3d 451, 455 (App.2003) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). Because engaging in the business of tattooing is a fundamental right, *see supra* ¶¶ 17, 26, the superior court was required to apply a strict scrutiny analysis to decide whether Mesa City Code § 11-6-3(B) serves a compelling government interest and is narrowly tailored to achieve that interest.[21] *Id.* at 279-80, ¶ 8, 77 P.3d at 454-55. This analytical paradigm is essentially the same as that employed to assess the Colemans' equal protection claim. *See supra* ¶ 26. For the reasons explained in discussing that claim, we likewise conclude the Colemans sufficiently stated a substantive due process claim to withstand a motion to dismiss; development of a factual record is warranted. *See supra* ¶ 27. The superior court therefore erred by granting Mesa's motion to dismiss the due process claim.

## CONCLUSION

¶ 30 For the foregoing reasons, we hold that a tattoo, the act of tattooing, and the business of tattooing constitute pure speech entitled to the highest level of protection under our state and federal constitutions. The Colemans sufficiently allege in the complaint that Mesa infringed their free speech, equal protection, and substantive due process rights by applying an unreasonable time, place, or manner restriction on operating tattoo parlors in Mesa. The court therefore erred by dismissing the complaint for failing to state a claim on which relief can be grant-

ed. We reverse the judgment and remand for further proceedings.

CONCURRING: PATRICK IRVINE and DONN KESSLER, Judges.

---

21. We reject Mesa's contention that its denial of the Permit must "shock the conscience" to constitute a deprivation of substantive due process. The shock-the-conscience standard applies to assess acts by government officials taken under legitimate authority; it does not apply to assess the constitutionality of legislative enactments. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (stating that "criteria to identify what is fatally arbitrary differ depending on whether [challenged government action] is legislation or a specific act of a governmental officer" and applying shock-the-conscience test to latter category); *Hawkins v. Freeman*, 195 F.3d 732, 738-39 (4th Cir.1999) (holding shock-the-conscience inquiry made only in substantive due process challenge to an executive act and is not used in facial or as

applied challenge to legislative enactment); *Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1182 (10th Cir.2009) ("[T]he 'shocks the conscience' standard is not applicable to cases in which plaintiffs advance a substantive due process challenge to a *legislative* enactment. Instead, it is an inquiry reserved for cases challenging *executive* action."); *but see Aegis*, 206 Ariz. at 568, 569, ¶¶ 43, 46, 81 P.3d at 1027, 1028 (characterizing town council's refusal to issue a special use permit as a legislative function and later stating that shock-the-conscience inquiry must be used to assess § 1983 claim that council deprived applicant of substantive due process). The Colemans make a facial and as applied challenge to Mesa City Code § 11-6-3(B). The shock-the-conscience inquiry plays no role in resolving that claim.